**UNITED STATES of America**

v.

**Melvin R. WADE, et al.**

**Civ. A. No. 79–1426.**

United States District Court,
E.D. Pennsylvania.

Dec. 20, 1983.

1327

Kevin Gaynor (argued), Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., Joseph J.C. Donovan, EPA, Region III, Philadelphia, Pa., Kermit Rader, EPA, Washington, D.C., for the U.S.

Patrick T. Ryan (argued), Cynthia J. Giles (argued), T. Andrew Culbert, Drinker, Biddle & Reath, Philadelphia, Pa., for Congoleum Corp.

Bertram A. Stone, Stone, Pogrund & Korey, Chicago, Ill., Austin J. McGreal, P.C., McGill & McGreal, P.C., Philadelphia, Pa., for Apollo Metals, Inc.

Henry S. Ruth, Jr., Scott D. Patterson (argued), Saul, Ewing, Remick & Saul, Philadelphia, Pa., Robert A. McTamaney, Carter, Ledyard & Milburn, New York City, for Sandvik, Inc.

Calvin P. Sawyier, Edward J. Wendrow, Sidney Margolis, Winston & Strawn, Chicago, Ill., James D. Wilder, Karen R. Pushaw, LaBrum & Doak, Philadelphia, Pa., for Gould, Inc.

Frank J. Marcone, Media, Pa., for Melvin R. Wade.

Larry H. Slass, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Trustee in Bankruptcy ABM Disposal Co., Inc.

William J. Winning, Burke Christensen, Curran, Winning & Fioravanti, P.C., Media, Pa., for Ellis Barnhouse.

Franklin P. Tyson, Conshohocken, Pa., Denis L. Brenan (argued), Deborah A. Lefco, Morgan, Lewis & Bockius, Philadelphia, Pa., for J.L. Clark Mfg. Co. and NL Industries, Inc.

David T. Modi, Wilmington, Del., David Richman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for E.I. duPont deNemours.

John I. McMahon, King of Prussia, Pa., for East Falls Corp.

Albert L. Bricklin, Bennett, Bricklin, Saltzburg & Fullem, Philadelphia, Pa., for Grow Group, Inc. (B.W. Coatings).

Thomas R. Harrington, Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for The Budd Co.

Anthony P. Tinari, Marshall, Dennehey, Warner, Coleman & Goggin, Norristown, Pa., Robert A. Swift, Kohn, Savett, Marion, & Graf, P.C., Philadelphia, Pa., for Diversified Printing.

Kathleen U. Poling, Moraga, Cal., James L. McKenna, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for Electro Coating Division, Electro Coatings, Inc.

William G. Cilingin, Naulty, Scaricamazza & McDevitt, Philadelphia, Pa., for Jordan Chemical Co.

David C. Toomey, Carolyn Mills, Duane, Morris & Hecksher, Philadelphia, Pa., for Texaco, Inc.

Donald K. Joseph, Wolf, Block, Schorr & Solis-Cohen, John M. Alivernini, Philadelphia, Pa., for Wyeth Laboratories, Inc.

William Sierks, Asst. Counsel, Com. of Pa., Dept. of Environmental Resources, Harrisburg, Pa., Kenneth Gelburd, Dept. of Environmental Resources Litigation, Asst. Counsel, Philadelphia, Pa., for Com. of Pa., Dept. of Environmental Resources.

## MEMORANDUM

NEWCOMER, District Judge.

In response to the well-publicized toxic waste problem Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act of 1980, commonly known as CERCLA or the Superfund Act. 42 U.S.C. § 9601 *et seq.* The Act's name is derived from its establishment of a $1.6 billion "hazardous substance response trust fund" to finance government clean-up of abandoned hazardous chemical waste dump sites. § 9631. In addition, the Act authorizes the government to undertake emergency clean-up measures when it determines that an abandoned site presents "an imminent and substantial danger to public health" and to seek emergency injunctive relief to abate the danger or threat. §§ 9604 and 9606. Finally, the government is authorized to recover certain costs incurred in clean-up and containment measures from designated classes of persons. § 9607.

This is a civil action brought by the United States against several parties allegedly responsible for the creation of a hazardous waste dump in Chester, Pennsylvania. The government seeks injunctive relief against Melvin R. Wade, the owner of the dump site, ABM Disposal Service, the company which transported the hazardous substances to the site, and Ellis Barnhouse and Franklin P. Tyson, the owners of ABM during the time period at issue ("non-generator defendants"). The government also seeks reimbursement of the costs incurred and to be incurred in cleaning up the site from the non-generator defendants as well as from Apollo Metals, Inc., Congoleum Corporation, Gould, Inc. and Sandvik, Inc. ("generator defendants").

The claims for injunctive relief are brought pursuant to § 7003 of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6973, and § 106 of CERCLA, 42 U.S.C. § 9606. The claims for monetary relief are based on § 107(a) of CERCLA, 42 U.S.C. § 9607(a), as well as a common law theory of restitution. Presently before the Court are the government's motions for partial summary judgment on the issue of joint and several liability under § 107(a) against each of the defendants. In addition, each of the generator defendants has moved for summary judgment.

For reasons discussed below, I will grant the generator defendants' motions for summary judgment on counts four and five to the extent those counts are based on a common law theory of restitution. Otherwise, all motions by and against the generator defendants will be denied. Summary judgment as to liability under § 107(a) will be entered against defendants Tyson, Wade and ABM, but I reserve judgment on whether joint and several liability will be imposed in this case. The government's motion for summary judgment against defendant Barnhouse will be denied. I trust that this opinion will provide guidance to the parties in their preparation for trial.

■ The generator defendants have filed a joint motion for summary judgment addressing issues common to all as well as individual motions addressing facts unique to each generator's case. The generator defendants first move for summary judgment on counts four and five which seek restitution for amounts expended or to be expended in investigating and abating conditions which present an endangerment to the extent recovery of these sums is based on a federal common law theory. The government opposition to this portion of the motion is based on its argument that § 7003 of RCRA, 42 U.S.C. § 6973(a), provides the government with an implied cause of action in restitution. Given the basis for my earlier dismissal of plaintiff's § 7003

claim against this group of defendants I must grant this portion of the generator defendants' motion for summary judgment. *See United States v. Wade*, 546 F.Supp. 785 (E.D.Pa.1982). Indeed, the United States concedes my prior ruling is dispositive of this issue.

The generator defendants' motions for summary judgment on the CERCLA claims generally advance two arguments.[1] First, they argue that the government has not and cannot establish the requisite causal relationship between their wastes and the costs incurred by the government in cleaning up the site. Second, assuming the government can establish liability under the Act, the generator defendants argue that it has recovered all costs to which it could possibly be entitled. Both arguments raise difficult questions of statutory interpretation which require some background discussion.

The Superfund legislation presents a relatively complex solution to a complex problem. It leaves much to be desired from a syntactical standpoint, perhaps a reflection of the hasty compromises which were reached as the bill was pushed through Congress just before the close of its 96th Session. Any attempt to divine the legislative intent behind many of its provisions will inevitably involve a resort to the Act's legislative history. Unfortunately, the legislative history is unusually riddled by self-serving and contradictory statements. Few courts have addressed the Act at all, and many of the issues raised in this case have not been litigated previously. What is clear, however, is that the Act is intended to facilitate the prompt clean-up of hazardous waste dump sites and when possible to place the ultimate financial burden upon those responsible for the danger created by such sites. With these thoughts in mind I turn to the generator defendants' causation argument.

## A. THE CAUSATION ARGUMENT

In a nutshell, the generator defendants' causation argument is as follows. To establish liability under the Act the government must prove a link, or more specifically a causal nexus, between costs incurred in clean-up and a given generator's waste. The argument is based on traditional tort concepts of proximate causation. The generator defendants first argue that the government has no admissible evidence that their wastes were in fact disposed of at the Wade site. The government agrees that actual dumping of a defendant's waste at the Wade site is an element of its case but urges that its evidence on this issue is not only admissible but also dispositive.

The controversy centers around the admissibility of the so-called ABM grid and the sufficiency of the affidavit of Frank Tyson, one of the owners of ABM Disposal Company prior to its bankruptcy. The generator defendants correctly state in their briefs that evidence offered to support or oppose a summary judgment motion must be admissible and if in affidavit form, it must be non-conclusory and based on the personal knowledge of the affiant. *Carey v. Beans*, 500 F.Supp. 580, 583 (E.D.Pa. 1980), *aff'd*, 659 F.2d 1065 (3d Cir.1981).

The generator defendants argue that Mr. Tyson lacks the personal knowledge necessary to state that their wastes were dumped at the Wade site. Clearly the Tyson affidavit is not a model affidavit. Nevertheless, it states that Tyson, as president of ABM, directed the disposal of wastes by his drivers and supervised the day-to-day operations of the company from September, 1976 until January 1, 1979. Prior to that time he was a salesman for the company. This support is adequate to survive defendants' motions for summary judgment; however, because Tyson's credibility, as a convicted felon and a defendant in the case, is seriously contested, his affidavit does not suffice to establish the fact of dumping by the defendants. The issue

---

**1.** Some of the arguments addressed below were not advanced in each of the generator defendants' individual motions. Rather than identify-ing which party has advanced any given argument I will simply refer to an argument raised by one defendant as an argument raised by all.

must be resolved at trial.[2] I am likewise unconvinced as to the admissibility of the ABM grid at this time. Assuming the government satisfies the requirements of FRE 803(6), because of the critical nature of this piece of evidence and its facial inscrutability I will not admit it at trial without some live testimony to explain it.

Even assuming the government proves that a given defendant's waste was in fact disposed of at the Wade site, the generator defendants argue it must also prove that a particular defendant's actual waste is presently at the site and has been the subject of a removal or remedial measure before that defendant can be held liable. In the alternative, the generator defendants argue that at a minimum the government must link its costs incurred to waste of the sort created by a generator before that generator may be held liable. This argument in part overlaps the defendants' argument pertaining to recoverable damages. Based on my reading of the Act, I must reject both causation requirements urged by the generator defendants.

The liability provision of CERCLA provides in relevant part as follows:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—...

(3) Any person who by contract, agreement, or otherwise arranged for disposal or treatment or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing *such* hazardous substances... (4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of *a* hazardous substance, shall be liable for—

(A) All costs of removal or remedial action incurred by the United States Government or a state not inconsistent with the national contingency plan."

42 U.S.C. § 9607(a) (emphasis added). At one extreme the Act could be read to impose liability on certain parties who merely arrange for transport of their waste but never actually do so. I do not understand the government to urge such a construction and would reject it. I mention the possibility only to underscore the lack of precision with which the statute was drafted.

Part of the generator defendants' argument revolves around the use of the word "such" in referring to the "hazardous substances" contained at the dump site or "facility." It could be read to require that the facility contain a particular defendant's waste. On the other hand it could be read merely to require that hazardous substances like those found in a defendant's waste must be present at the site. The legislative history provides no enlightenment on this point. I believe that the less stringent requirement was the one intended by Congress.

■ The government's experts have admitted that scientific technique has not advanced to a point that the identity of the generator of a specific quantity of waste can be stated with certainty. All that can be said is that a site contains the same kind of hazardous substances as are found in a generator's waste. Thus, to require a plaintiff under CERCLA to "fingerprint" wastes is to eviscerate the statute. Given two possible constructions of a statute, one which renders it useless should be rejected. Generators are adequately protected by requiring a plaintiff to prove that a defendant's waste was disposed of at a site and that the substances that make the defend-

---

**2.** I am not unmindful of Congoleum's contention that the Tyson affidavit is clearly inadequate as to its wastes because Congoleum had ceased its dealings with ABM one month prior to Tyson becoming president of ABM. Nevertheless, Tyson's role as a salesman for ABM during the period in which ABM handled Congoleum's waste is adequate to support the contested portion of the affidavit.

ant's waste hazardous are also present at the site.[3]

Besides eviscerating the statute the generator defendant's contention would lead to ludicrous results. For example, assuming wastes could be "fingerprinted," once all the hazardous substances in a generator's waste had migrated from the "facility" the generator could no longer be held liable. In fact, one generator makes this argument.

■ I turn now to the generator defendants' contention that the government must link its costs incurred to wastes of the sort created by them.

A reading of the literal language of the statute suggests that the generator defendants read too much into this portion of its causation requirement.[1] Stripping away the excess language, the statute appears to impose liability on a generator who has (1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator (3) if there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs. Thus, the release which results in the incurrence of response costs and liability need only be of *"a"* hazardous substance and not necessarily one contained in the defendant's waste. The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site. I base my disagreement with defendants' reading in part on

the Act's use of "such" to modify "hazardous substance" in paragraph three and the switch to "a" in paragraph four.

Additional support for my reading may also be found in the legislative history of the Act. The original House Committee bill imposed liability on "any person who caused or contributed to the release." H.R. 7020, 96th Cong., 2d Sess., § 3071(a)(1), 126 Cong.Rec. at H9459 (daily ed. September 23, 1980).[5] Although the committee bill was changed in several important respects by the full House, this language was also contained in the final House-passed version. *Id.* at H9479. This language clearly requires a causal nexus between a generator and the release causing the incurrence of response costs, and the House Committee understood it to do so:

"The Committee intends that the usual common law principles of causation, including those of proximate causation should govern the determination of whether a defendant 'caused or contributed' to a release or threatened release.... Thus, for instance, the mere act of generation or transportation of hazardous waste or the mere existence of a generator's or transporter's waste in a site with respect to which clean-up costs are incurred would not, in and of itself, result in liability under § 3071. The committee intends that for liability to attach under this section, the plaintiff [government] must demonstrate a causal or contributory nexus between the acts of the defendant and the conditions

---

3. I also reject the arguments that the government must establish that the generator selected the site at which the wastes were dumped and that transfer of ownership of the waste to ABM at the time of pick-up for disposal absolves the generator of liability. Neither argument finds any support in the language of the statute.

4. The argument also is based on an inaccurate premise. The generator defendants contend that the only recoverable money spent to date was for the removal of drums of PCB's which are not contained in any of their waste streams; however, an additional $421,300 has been spent on investigating, monitoring, testing, and evaluating the situation at the Wade site which is

recoverable as a cost of removal. § 9601(23) and § 9604(b). Thus, recoverable funds have been spent which are traceable to the wastes of virtually any party otherwise liable under the Act.

5. The draft Senate version of CERCLA imposed a similar requirement. Staff Working Paper # 1 on S.1480: Senate Comm. on Envir. and Pub. Works 96 Cong., 2d Sess. § 4(a) (February 1, 1980), reprinted in *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980*, Senate Comm. on Envir. and Pub. Works, S.Doc. No. 97–14, 97th Cong., 2d Sess. (1983).

which necessitated response action under § 3041."

U.S. Congress, House of Representatives, Interstate and Foreign Commerce Committee, House Report 96–1016, May 16, 1980, *reprinted in* 1980 U.S.Code Cong. & Adm. News 6119, at 6136–6137. The problem with the generator defendants' reliance on this report, however, is that the liability provision which was ultimately enacted bears no real resemblance to the House-passed bill to which the report refers. Instead, the legislation enacted specifies certain groups which will be held liable when a release of a hazardous substance causes the incurrence of clean-up costs. One of those groups is those who have disposed of hazardous substances at the site if hazardous substances of that sort are present at the site.

Deletion of the causation language contained in the House-passed bill and the Senate draft is not dispositive of the causation issue. Nevertheless, the substitution of the present language for the prior causation requirement evidences a legislative intent which is in accordance with my reading of the Act.

■ The generator defendants' next argument is based on the § 9607 requirement of a release or threatened release from a facility. In essence they argue that no release or threatened release of their hazardous substances has occurred. As found above, the release need not be of a particular defendant's waste for that defendant to be held liable. Nevertheless, a release of someone's hazardous wastes must occur.

The government advances two arguments in support of its position that a

release or threatened release has occurred.[6] It first relies on four affidavits of Dr. Eugene Meyer that hazardous substances found in each of the generator defendants' wastes have leached or are leaching into the soil and groundwater at the site. No one contests that such leaching would constitute a "release."

Instead, some of the defendants have challenged Dr. Meyer's affidavits as conclusory and have questioned his competence to testify on this issue. I reject both challenges. Other defendants have submitted affidavits contesting Dr. Meyer's conclusions. This creates an issue of material fact for trial and thus bars summary judgment.

## B. COSTS RECOVERABLE UNDER THE ACT

The generator defendants next argue that a prerequisite to liability under the Act is that the government have incurred recoverable clean-up costs. They contend that because the government cannot incur any recoverable costs beyond those incurred to date and because the government has been fully compensated for their costs by settling generators the remaining generators cannot be held liable. To prevail on this argument they must establish that (1) § 107 does not permit recovery of future clean-up costs and (2) § 104 limitations on fund expenditures also limit § 107 liability.

The factual basis for the defendants' argument is as follows. The federal government has spent roughly $689,000 [7] in cleaning up the Wade site. Some $1.9 million has been paid by generators other than the generator defendants in settlement of claims arising out of clean-up of the Wade

**6.** The second argument, that mere dumping constitutes a release, need not be addressed at this stage since I have concluded that the government has not yet established this fact with respect to these defendants; however, I am uninclined to accept this position because it would lead to the conclusion that any disposal of hazardous waste would create potential CERCLA liability. I note also that the government apparently relies on the release of hazardous substances other than those created by the generator defendants although it has not clearly articulated the theory. Given the undisputed

history of this site, however, I believe a defense based on the government's failure to establish the occurrence of a release, or a threatened release, is a weak one.

**7.** The generator defendants actually argue that the federal government has only $267,500 in compensable expenditures; however, given my ruling on the recoverability of § 104(b) costs, *supra* at 1333, the generators' figure must be increased accordingly.

site. If the federal government is not entitled to recover for clean up costs to be incurred in the future then its injury, $689,000, has been more than adequately compensated.

In response, the government asserts the statute permits recovery of future clean-up costs. Even assuming the statute does not permit such a recovery the government argues that the $1.9 million received has not been, and was not intended to be, applied entirely to costs incurred to date by the federal government. Instead, some portion of the amounts received was to be applied to future clean-up costs and some was to be applied to expenses incurred by the Commonwealth of Pennsylvania in cleaning up the site.[8]

■ The defendants' first argument, that § 107 authorizes recovery only of costs incurred, as opposed to costs to be incurred, presents the greater problem. The argument is based upon the language of the statute which is in fact written in the past tense. Assuming the defendants are correct in their argument that costs to be incurred are not recoverable, an issue I leave open, construction of the statute nevertheless presents problems.

First, it makes no reference to the date by which the costs must have been incurred in order to be recoverable. Thus, the statute may be read to permit recovery only of those costs incurred prior to filing of a complaint. In the case of a lengthy or bifurcated trial it may be read to require only that the costs be incurred prior to the hearing on damages. Such a reading would not rewrite the statute to permit recovery of costs "to be incurred" because it would still bar recovery of speculative future costs. Similarly, it does not define "incurred." The term might refer either to amounts actually paid or to amounts for services contracted for but not yet performed.

The legislative history provides no guidance on this issue. I believe the broader construction, however, better effectuates the purposes of the Act and is, at a minimum, what the statute permits. Such a reading permits the government to sue potentially responsible parties after emergency measures have been undertaken but before the clean-up process has been completed. If a determination of no liability is reached the government may well decide to devote its limited resources to the abatement of other more hazardous sites. *See United States v. Royal Hardage,* CIV–80–1031–W (W.D.Okl. December 18, 1982). The generator defendants' argument would have greater force were it clear from the outset that restrictions contained in CERCLA bar any further expenditures at the site; however, I reject that argument below.

■ The generator defendants argue that § 104, which restricts expenditures from the Superfund, likewise restricts their liability under § 107 and that the section also bars any future expenditures by the government at the Wade site. Thus, they argue, even assuming § 107 permits recovery for costs to be incurred in the future, the government is precluded from spending any more money at this site. Section 104 bars Fund expenditures for remedial actions[9] unless the state in which the release occurs enters into a cooperative agreement with the federal government. 42 U.S.C. § 9604(c)(3). In essence, the state must agree to pay a portion of the remedial costs and to maintain clean-up actions initiated by the federal government. Section 104 also bars Fund expenditures after six months have elapsed from the date of initial response to a release or threatened release unless certain findings are made

---

8. The Commonwealth of Pennsylvania, which was a party to the settlement agreements, is alleged to have spent in excess of $800,000 at the site which would be recoverable under the Act. *See* § 9607(a)(4)(A).

9. The Act defines "remedial" actions essentially as long-term or permanent measures. "Removal" actions are generally those intended to be short-term measures. "Response" measures include both remedial and removal measures. 42 U.S.C. § 9601(23), (24), and (25).

with respect to the need for immediate action. § 9604(c)(1).

The generator defendants err in attempting to link liability under § 107 to restrictions placed on Superfund expenditures under § 104. The clear language of § 107 negates any such interdependence of the two sections. Liability is imposed under § 107 for "*all* costs of removal or remedial action ... not inconsistent with the national contingency plan." Furthermore, liability is imposed "*notwithstanding* any other provision or rule of law, and subject only to the defenses set forth in subsection (b)." Another district court likewise concluded on the basis of this language that "Section 107(a) was meant to stand by itself; liability under it can be determined without the numerous inquiries [into § 104 and § 111 limitations on Fund expenditures] suggested by the defendant." *United States v. Reilly Tar and Chemical Corp.*, 546 F.Supp. 1100, 1118 (D.Minn.1982).

In addition, an overview of the statutory scheme supports this conclusion. The § 1.6 billion Superfund has been repeatedly acknowledged as an inadequate response to the immense cost of cleaning up existing hazardous waste sites.[10] Section 104 sets restrictions on the use of Superfund money to prevent improvident or disproportionate use of a limited fund to clean up only a few of the many sites for which no solvent, responsible parties can be found.

Section 107, on the other hand, is intended to impose liability on the responsible parties who created and/or dumped the hazardous wastes. The restrictions contained in § 104 are intended to protect the integrity of the Superfund and not limit the government's replenishing it by recovery from responsible parties. Thus, the fact that government expenditures at the Wade site are not authorized by § 104 affects only the availability of Superfund money, and not the generator defendants' liability.

■ Finally, the generator defendants apparently believe that the Pennsylvania Joint Tortfeasor Act, 42 Pa.C.S.A. § 8321 *et seq.*, will be wholly circumvented if a non-party, such as the Commonwealth of Pennsylvania, can be included in a settlement agreement. According to the generator defendants, circumvention will be further encouraged by permitting a settling party to designate the items for which it is compensating the plaintiff. The primary danger the generator defendants foresee is that of double recovery.

The generator defendants' argument might have some merit were some collusion involved in the settlement agreements which would lead to dual recovery. For example, had the non-party to the settlement agreement been one inherently not entitled to recover from these defendants and included merely to boost plaintiff's recovery, I would be inclined to agree with the defendants; however, that is not the case. CERCLA clearly permits a state to recover its costs incurred in removal or remedial actions and the Commonwealth is alleged to have incurred costs in this connection. 42 U.S.C. § 9607(a)(4)(A). Similarly, it might have merit if the items to which the settlement fund was to be applied were items which were inherently not recoverable under the Act. This, too, is not the case. Indeed, some of the costs that were intended to be included in the phrase "future costs" at the time the agreements were entered into may well have been incurred by now.

Of course, the future may ultimately reveal that the settling generators have compensated the federal government for claims on which the government would not have prevailed. This is simply the risk inherent in all settlements. I foresee none of the dangers urged by the generator defendants, at least not on the facts of this case.

■ No useful purpose will be served by conducting a lengthy trial on the merits if it is clear at the outset that the federal government is not entitled to any compensation from these defendants; however, I do not believe this is the case. First, as

---

10. *See, e.g.*, H.R.Rep. No. 1016, pt. 1 at 20, *reprinted in* U.S.Code Cong. & Ad.News at 6123; Eckhardt, *The Unfinished Business of Hazardous Waste Control,* 33 Baylor L.Rev. 263 (1981).

noted above, the government is clearly not barred by § 104 from spending additional money at the site which would be recoverable from these defendants if liability is otherwise established. In addition, the amount the federal government, as opposed to the Commonwealth of Pennsylvania, has received from the settling defendants is unclear. Finally, the intent of the parties as to the appropriation of the settlement fund has not been established. Because I do not believe the issue is clear I will deny the generator defendants' motion for summary judgment insofar as it is based on the contention that the government has no recoverable damages.

## C. JOINT AND SEVERAL LIABILITY

The government seeks partial summary judgment holding each defendant jointly and severally liable under section 107(a) of CERCLA. Assuming certain statutory prerequisites are established, I believe the Act permits, but does not require, the imposition of joint and several liability. For reasons discussed below, I do not believe the facts are adequately developed for a determination of whether joint and several liability should be imposed in this case. My conclusions on this issue have recently been confirmed in *United States v. Chem-Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983).

The generator defendants' argument that CERCLA does not permit the imposition of joint and several liability is based on the deletion from the Act of an explicit reference to joint and several liability and on Senator Helms' explanation of the deletion:

> Retention of joint and several liability in S. 1480 received intense and well-deserved criticism from a number of sources, since it could impose financial responsibility for massive costs and damages awards on persons who contributed only minimally (if at all) to a release or injury. Joint and several liability for costs and damages was especially pernicious in S.1480 not only because of the exceedingly broad categories of persons

subject to liability and the wide array of damages available, but also because it was coupled with an industry-based fund. Those contributing to the fund will be frequently paying for conditions that they had no responsibility in creating or even contributing to. To adopt a joint and several liability scheme on top of this would have been grossly unfair. The drafters of the Stafford-Randolph substitute have recognized this unfairness and the lack of wisdom in eliminating any meaningful link between culpable conduct and financial responsibility. Consequently, all references to joint and several liability in the Bill have been deleted.

126 Cong.Rec. at S15004 (Nov. 24, 1980)

A reading of the entire legislative history, however, reveals that deletion of the reference to joint and several liability was intended to avoid mandatory application of that standard to a situation where it would produce inequitable results. For example Senator Randolph, who introduced the amendment deleting reference to joint and several liability, commented "we have deleted any references to joint and several liability, relying on common law principles to determine when parties should be severally liable." 126 Cong.Rec. at S14964 (Nov. 24, 1980). Similar comments were made by Representative Waxman. *Id.* at H11799 (Dec. 3, 1980). Representative Florio, the chief sponsor of the legislation in the House, stated:

> Issues of joint and several liability not resolved by this shall be governed by traditional and evolving principles of common law. The terms joint and several have been deleted with the intent that the liability of joint tortfeasors be determined under common or previous statutory law.... To insure the development of a uniform rule of law, and to discourage business dealing in hazardous substances from locating primarily in States with more lenient laws, the bill will encourage the further development of a Federal common law in this area.

*Id.* at H11787. Finally, several Representatives characterized the final version as

essentially the same as the original House version. *See, e.g.,* 126 Cong.Rec. at H11,-799 (Dec. 3, 1980) (remarks of Rep. Jeffords) and H11,796 (remarks of Rep. Mikulski). The original House-passed bill permitted the Court to apportion damages in conjunction with specific statutory guidelines. Joint and several liability was to be imposed if the defendant failed to meet the apportionment criteria. H.R. 7020 96th Cong., 2d Sess., § 3071(a)(2)(B), 126 Cong. Rec. at H9479 (Sept. 23, 1980).

Thus, I believe that in deleting the reference to joint and several liability Congress intended that courts apply common law principles in determining the scope of liability under CERCLA. Having reached this conclusion I must now determine whether state or federal common law controls. As noted above, the legislative history is not conclusive on this point, and the legislators' understanding of the common law was not uniform.

 Federal courts may create federal common law when "necessary to protect uniquely federal interests." *Texas Industries v. Radcliff Materials,* 451 U.S. 630, 640, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981). The problems presented by improper disposal of hazardous wastes have become problems of national magnitude. One factor giving rise to the enactment of CERCLA was the failure of states to address adequately the growing problem of hazardous waste dumps. At the time of CERCLA's passage, the EPA estimated that as many as 30,000 to 50,000 inactive and uncontrolled hazardous waste sites existed in the United States, about 20 to 30 percent of which contained wastes created by offsite generators. The EPA estimated that clean-up of the 1200 to 2000 most

dangerous sites would cost $13.1 billion to $22.1 billion.[11]

 State common law varies on the imposition of joint and several, as opposed to apportioned, liability on joint polluters.[12] Thus, resort to state law on this issue would result in needless uncertainty and lack of uniformity. A liability standard which varies from state to state would undermine the policy of the statute by encouraging illegal dumping in states with lenient liability laws. Because of the strong federal interest in the abatement of toxic waste sites and the need for a uniform liability standard I conclude that Congress intended the development of a federal common law on the issue of the scope of liability under § 107 of CERCLA and that this is an area in which the development of such law is proper.

 I agree with the *Chem-Dyne* decision that joint and several liability should be imposed in cases brought under § 107 of CERCLA unless the defendants establish that a reasonable basis exists for apportioning the harm amongst them. This rule would be in accord with the position adopted by the Restatement (Second) of Torts:

(1) Damages for harm are to be apportioned among two or more causes where

 (a) there are distinct harms, or

 (b) there is a reasonable basis for determining the contribution of each cause of a single harm.

Restatement (Second) of Torts § 433A

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of

---

**11.** *See Hazardous and Toxic Waste Disposal: Joint Hearings on S.1341 and S.1480 Before the Subcomms. on Environmental Pollution and Resource Protection of the Senate Comm. on Environment and Public Works,* 96th Cong., 1st Sess. (1979); H.R.Rep. 1016, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119.

**12.** *Compare Michie v. Great Lakes Steel Div.,* 495 F.2d 213 (6th Cir.1974) (burden of proof on

defendant to provide reasonable basis for apportionment or else be held jointly and severally liable) and *Azure v. City of Billings,* 182 Mont. 234, 596 P.2d 460 (1979) with *Masonite Corp. v. Steede,* 198 Miss. 530, 23 So.2d 756 (1945) and Restatement of Torts § 881 (1939) (defendant can be held liable only for portion of harm he caused). Undoubtedly many states have not considered the issue in recent years.

apportionment among them, the burden of proof as to the apportionment is upon each such actor.

Restatement (Second) of Torts § 433B.

Such a rule does not unfairly hamper the ability of the government to recover its costs incurred in cleaning up hazardous waste dump sites.[13] Likewise it helps to ameliorate the harshness of the liability provisions of the statute. Finally, it appears to embody the general congressional intent of placing liability for toxic waste clean-up as nearly as possible on those responsible for creating the hazard.

## D. DEFINITION OF "HAZARDOUS SUBSTANCE"

■ One final issue contested by all the generator defendants centers on the statutory definition of "hazardous substance." The statute defines that term as "any substance" designated pursuant to the provisions of specified federal environmental protection laws. In establishing the generator defendants' liability the government relies on a list of "hazardous substances" promulgated pursuant to § 311(b)(2)(A) of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.*, and the list of "toxic pollutants" promulgated pursuant to § 307 of the FWCPA. These lists are contained in 40 C.F.R. § 116.4 and § 401.15, respectively. The government maintains that the presence of any of the listed substances or pollutants in a generator's waste makes that waste a "hazardous substance" for purposes of CERCLA liability without regard to concentration or quantity.

Not all discharges of "hazardous substances" or "toxic pollutants" lead to FWPCA liability. Instead, liability is imposed if a discharge contains a "reportable quantity" of a hazardous substance, § 311(b)(4), or is in excess of the "effluent

standards" for a toxic pollutant. § 307(d). Reportable quantities for hazardous substances are listed at 40 C.F.R. § 117.3 and effluent standards for certain toxic pollutants are published at 40 C.F.R. § 129.4 *et seq.*

The generator defendants contend the government's motion for summary judgment must be denied because the government has failed to establish that their wastes contain a reportable quantity of hazardous substances under § 311 or toxic pollutants in excess of the stated effluent guidelines under § 307. Indeed, the government denies the necessity of so doing. The government contends that under CERCLA no reportable quantity or effluent standard need be determined for hazardous substances incorporated by reference to §§ 307 and 311 of FWPCA. Only substances designated as hazardous pursuant to § 102 of CERCLA have reportable quantity requirements for CERCLA purposes.[14]

In support of its position the government cites certain passages from the report accompanying the Senate bill as reported by the Senate Committee on Environment and Public Works. Sen.Rep. 96–848, 96th Cong., 2nd Sess., 24–29 (1980). Without going into detail, the cited passages discuss provisions in the Senate bill which were greatly altered in the statute as finally enacted. Thus the cited portions stating that no reportable quantity need be determined for hazardous substances incorporated by reference to other environmental protection laws in § 101(14) simply cannot be squared with § 102(b) as finally enacted.

This leaves unresolved the issue of whether CERCLA, like FWPCA, imposes liability only for discharges containing reportable quantities of hazardous substances or exceeding effluent standards for toxic pollutants. Having already concluded

**13.** Of course certain issues, which I need not decide, could have a bearing on this. For example, left undecided is the problem of who bears the burden of insolvent or unavailable defendants.

**14.** § 102 of CERCLA permits the Administrator of the Environmental Protection Agency (EPA) to designate hazardous substances in addition to those referred to in § 101(14) and to determine reportable quantities for substances so designated.

that triable issues exist I need not decide this issue at this time; however, in the interest of expediting trial once it begins I will rule on this issue now. What the government must prove to establish that a defendant's wastes are hazardous is that the waste contains an unspecified quantity of substances designated as hazardous or toxic under the statutes specified in CERCLA's definition of "hazardous substance."

Certainly the definition of hazardous substances contained in § 101 of CERCLA supports the government's position. The definition refers only to the provisions of FWPCA authorizing the designation of hazardous substances and toxic pollutants and not to those authorizing promulgation of reportable quantities or effluent standards. Likewise § 107 makes no reference to reportable quantities or effluent standards as do its FWPCA counterparts. On the other hand, as the generator defendants point out, this interpretation could lead to the absurd result that a penny is a hazardous substance, the disposal of which could lead to CERCLA liability, by virtue of the inclusion of copper on the list of toxic pollutants promulgated pursuant to § 307 of FWPCA.

Nevertheless, merely incorporating FWPCA effluent standards and reportable quantities into CERCLA requirements is not without its problems. First, I am not persuaded that incorporation of standards created with respect to water pollution into a statute directed at the disposal of hazardous wastes on land makes any sense. If it does not it lessens the probability that such incorporation was intended by Congress.

Second, I am unclear why Congress would incorporate these standards from FWPCA into CERCLA when § 102 of CERCLA establishes reportable quantities for purposes of the statute's reporting requirements. That section provides as follows:

(b) Unless and until superceded by regulations establishing a reportable quantity

under subsection (a) of this section for any hazardous substance as defined in section 9601(14) of this title, (1) a quantity of one pound, or (2) for those hazardous substances for which reportable quantities have been established pursuant to section 1321(b)(4) of Title 33, such reportable quantity, shall be deemed that quantity, the release of which requires notification pursuant to section 9603(a) or (b) of this title.

42 U.S.C. § 9602(b). This provision may have been aimed at the fact that EPA has promulgated effluent standards for only a few toxic pollutants designated pursuant to § 307(a) of FWPCA and apparently has no plans to promulgate additional standards in the immediate future. *See NRDC v. Train*, 8 ERC 2120 (D.D.C.1976), *rev'd in part on other grounds sub nom. NRDC v. Costle*, 561 F.2d 904 (D.C.Cir.1977).

Third, given the standard established by § 102 for designating additional substances as hazardous, Congress may well have intended to vest a great deal of discretion in the Executive branch in its prosecutorial decisions. A substance may be designated as hazardous if, upon release into the environment, it "may present substantial danger to the public health or welfare or the environment." [15] 42 U.S.C. § 9602(a).

Similarly, the interim standard for reportable quantities under CERCLA—one pound for all substances except those designated pursuant to § 311(b)(2)(A) of FWPCA—suggests that Congress intended a result almost as drastic as the one the generator defendants posit. If Congress intended CERCLA liability only for those whose discharges contained reportable quantities of hazardous substances, and if the reportable quantities are determined by reference to § 102, a defendant could be held liable for the disposal, not of one penny, as the defendants fear, but of a pound of pennies.

---

**15.** *Compare* § 311(b)(2)(A) of FWPCA. Under that section substances which upon "discharge in any quantity [into certain waters] ... present

an imminent and substantial danger to the public health or welfare" may be designated as hazardous. 33 U.S.C. § 1321(b)(2)(A).

Finally, I believe the defendants' fears of draconian liability are overstated. Given my ruling on joint and several as opposed to apportioned liability, a defendant whose sole contribution to a hazardous waste dump site was a copper penny would not be responsible for the entire cost of cleaning up the site.

The affidavits of Eugene Meyer, together with the admissions of the defendants referred to in the affidavits, establish that the waste streams of each of the defendants contain hazardous substances within the meaning of CERCLA. The government therefore need not establish at trial that the generator defendants' wastes are hazardous substances.[16] As noted above, however, it must prove that such wastes were disposed of at the Wade site and that hazardous substances of that sort are found at the site.[17]

### E. NON–GENERATOR DEFENDANTS

Of the non-generator defendants, only Ellis Barnhouse, one of the former owners of ABM Disposal Company, contests the entry of partial summary judgment on the issue of joint and several liability. To the extent they are applicable, Barnhouse raises the defenses raised by the generator defendants. He also argues he cannot be held individually liable for acts performed in his capacity as president of the corporation. For reasons discussed below the government's motion as to this defendant is denied.

The applicable section of CERCLA provides as follows:

(4) Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which

there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a state not inconsistent with the national contingency plan.

42 U.S.C. § 9607.

Barnhouse does not contest that he accepted hazardous substances for transport to a disposal facility. He also does not contest that a release of hazardous substances from the facility has occurred. Instead he first incorporates the generator defendants' arguments discussed above concerning costs recoverable under the Act. My earlier reasoning is equally applicable here and the arguments are therefore equally unavailing.

 Barnhouse also argues he cannot be held personally liable because all of his actions with respect to the Wade site were taken in his capacity as officer of ABM. A corporate officer may be held liable if he personally participates in the wrongful, injury-producing act. *In Re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 398 (E.D.Pa.1981); *Amabile v. Auto Kleen Car Wash*, 249 Pa.Super. 240, 376 A.2d 247 (1977).

 The government relies primarily on the deposition testimony of Robert Rector to establish Barnhouse's individual liability. Mr. Rector recalls that Barnhouse personally brought drums to the site. He does not specify any other details such as how many drums Barnhouse brought, how often he brought them, or what they contained. Without reaching the merits of Barnhouse's argument that a deposition

---

16. I am not unmindful of Sandvik's allegations that as of November, 1980 its waste was eligible for individual delisting consideration and that it filed such a delisting petition in August of 1982; however, assuming Sandvik is entitled to have its waste delisted and assuming further the EPA had acted upon the petition promptly, such delistings are not retroactive.

17. I need more information of an expert nature before deciding whether the hazardous substances must be present in any particular quantity or concentration. For example, I gather some substances designated as "hazardous" are found in the environment in the normal course of events.

1342

taken prior to service of the complaint cannot be used against him, I find this testimony inadequate to establish Barnhouse's individual liability. The mere placement of drums at the site will not suffice to establish that Barnhouse participated in the wrongful injury producing activity.

The fact that Barnhouse negotiated with Wade for disposal of wastes on Wade's property also does not establish Barnhouse's personal liability. Wastes can be disposed of without giving rise to CERCLA liability and thus the mere negotiation of an agreement to do so is not the wrongful injury-producing act which is the subject of the government's complaint.

In addition, the government's allegation in its complaint that Barnhouse directed or participated in the disposal of wastes at the Wade site is inadequate to establish Barnhouse's personal liability since Barnhouse in his answer denied the allegation.

Finally Barnhouse contends he can be held liable only for costs associated with dumping which occurred between 1974 and September 1976, the period during which he was president of ABM. I reject this argument. As I found above, the Act permits the imposition of joint and several liability for all costs incurred in clean-up for those subject to its provisions. Nevertheless, I believe the record is not yet ripe for a determination of whether joint and several or apportioned liability is appropriate and will deny the government's motion for summary judgment to the extent it seeks a decision on this issue now.