UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL
COMPANY, et al.,
Defendants.

No. 82–0983–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

Dec. 12, 1985.
Supplemental Opinion Jan. 9, 1986.

392

Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Land Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., Ken Weinfurt, Asst. U.S. Atty., Kansas City, Mo., John Wittenborn, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, FMC Corp., Philadelphia, Pa., for FMC Corp.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Williams, Covington & Burling, Washington, D.C., for IBM Corp.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for third party plaintiffs.

Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Norman Hjersted.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Legal Dept., Armco, Inc., Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

## MEMORANDUM ORDER

SCOTT O. WRIGHT, Chief Judge.

The Court held a hearing on October 21, 1985, in order to consider a proposed Preliminary Agreement entered into between the plaintiff United States and the four original generator defendants (Armco Inc., AT & T Technologies Inc., FMC Corporation, and International Business Machines Corporation) and to conduct an evidentiary hearing concerning endangerment and the remedy proposed for the cleanup of the Conservation Chemical Company site and the response costs incurred or to be incurred by the four original generator defendants. Prior to ruling on the issues presented to the Court at the hearing, however, it is necessary for purposes of the record to explain the current procedural posture of the case.

Since the time of the pretrial conference held on July 16, 1984, this case has been bifurcated for purposes of trial. At the risk of oversimplification, Phase I of the trial was to consist of various liability issues, including endangerment and remedy, and certain insurance issues, while Phase II of the trial was to consist of an apportionment of the necessary response costs among the parties and all other remaining issues. A more in-depth analysis of the bifurcation is contained in prior Orders of the Court and recommendations of the Special Master. *See* Pretrial Order, July 20, 1984; Special Master's Recommendation Concerning Class Certification and Bifurcation, filed November 14, 1984, approved by Order, November 27, 1984. The Phase I trial was scheduled to commence on May 28, 1985. However, on May 25, 1985, the parties announced to the Court that they had made substantial progress toward settlement and requested that the trial be continued so that they could finalize a settlement agreement. The Court continued the Phase I trial indefinitely and scheduled a hearing for June 24, 1985 at which the parties were to report to the Court concerning the progress in settlement negotiations. *See* Order, May 28, 1985. At the hearing on June 24, 1985, however, it became clear to the Court that the proposed settlement might not be reached. Therefore, the Court rescheduled the Phase I trial to commence on July 15, 1985, unless a consent decree were filed by the parties on or before July 12, 1985. *See* Order, June 26, 1985. Subsequently, the parties jointly requested a further continuance in order to facilitate settlement negotiations and repre-

sented to the Court that there was a substantial likelihood of a remedial consent decree if, and only if, a continuance were granted. Throughout this litigation, the Court has encouraged settlement among the parties and therefore granted an additional continuance of the Phase I hearing until August 5, 1985, requiring a consent decree to be filed by August 2, 1985. *See* Order, July 3, 1985. A short time thereafter, the United States Court of Appeals for the Eighth Circuit issued a writ of mandamus to the Court which, in effect, required that the Court, rather than the Special Master, conduct the Phase I trial as it related to questions of liability. *In re: Armco, Inc.*, 770 F.2d 103 (8th Cir.1985). On August 2, 1985, the plaintiff United States and the four original generator defendants filed their Preliminary Agreement with the Court and the Phase I trial scheduled to commence on August 5, 1985 was cancelled.

On September 24, 1985 the Court issued an Order which scheduled a hearing to take place on October 21, 1985. The hearing was designed to serve several purposes. First, the hearing was to be held to determine the appropriateness of the remedy provisions of the Preliminary Agreement. Furthermore, pursuant to the Court's authority under Federal Rules of Civil Procedure, Rule 42, the hearing was to constitute the trial on the merits of several issues in the litigation: first, whether the third-party plaintiffs have incurred, or will incur, pursuant to the terms of the Preliminary Agreement, response costs for which they may seek contribution from other parties; and second, whether any such response costs are consistent with the National Contingency Plan within the meaning of 42 U.S.C. § 9607(a)(1)—(4)(B). Order, September 24, 1985.

The hearing was held and completed on October 21, 1985. Prior to the hearing, the original generator defendants/third-party plaintiffs had reached separate settlement agreements with all but a few of the third-party defendant generators. The following parties were in attendance at and participated in the hearing: the plaintiff United States; original defendants Conservation Chemical Company, Conservation Chemical Company of Illinois and Norman Hjersted; original generator defendants/third-party plaintiffs Armco Inc., AT & T Technologies Inc., FMC Corporation and International Business Machines Corporation; third-party defendant General Dynamics Corporation; third-party defendant Wellman Dynamics Corporation; third-party defendant American Centennial Insurance Company. Also in attendance at the hearing were the Special Master, Professor Robert H. Freilich and his assistant, Neil R. Shortlidge, of the Herrick, Feinstein law firm, and the court-appointed experts, Dr. Roy O. Ball, P.E., and James W. Pollich, P.E. of ERM–North Central, Inc. In addition, a non-party, the Missouri Coalition for the Environment, was represented by an attorney who participated in the proceedings. Finally, a number of parties to the litigation entered their appearances but did not actively participate in the hearing.

The plaintiff United States presented evidence through the testimony of two witnesses, Mr. Robert Morby, the chief of the Superfund Branch of Region VII of the Environmental Protection Agency, and Mr. Murdock J. Cullinane, Jr., P.E., a research civil engineer with the Waterways Experiment Station of the United States Army Corps of Engineers. In addition to the testimony of these two witnesses, the plaintiff offered six exhibits which were received into evidence: an aerial photo/map of the Conservation Chemical Company site; a map of the area of the CCC site depicting other facilities and wells in the location of the CCC site; the Focus Feasibility Study For Conservation Chemical Company Site prepared for the plaintiff; a chart depicting the proposed remedial action for the CCC site; a chart providing a detailed illustration of the proposed cover for the CCC site; and a chart illustrating the proposed slurry wall containment system with withdrawal wells. The original generator defendants/third-party plaintiffs presented testimony from Dr. Paul Andrew Hustad, the manager of the geotechnical

department of the Burns & McDonnell Engineering Company, Kansas City, Missouri. The third-party plaintiffs also introduced into evidence a series of exhibits which consisted of a summary of the costs which they incurred on a remedial investigation and feasibility study, a list of the various tasks that were performed on the remedial investigation study and a compliation or listing of the invoices that were sent to the third-party plaintiffs for payment from the various consultants that were involved in the project. No other parties presented direct evidence by way of testimony or exhibits.

■ Prior to making findings of fact and conclusions of law, it should be noted that a number of parties filed objections to the hearing and submitted legal memoranda raising a number of points regarding the hearing. The objections emanated from the desire of the non-settling parties not to be bound by any determination of the Court concerning the appropriateness of the remedy proposed. Thus, the parties argued that the standard of review for Court consideration of a settlement agreement is less stringent than the standard which must be applied in a trial and that the settling parties were attempting to shift the burden of proof on the remedy to the non-settling parties. As the Court advised the parties at the hearing, these objections are without merit. The fundamental flaw in the reasoning behind the objections lies in the parties' lack of understanding of the Court's order of September 24, 1985, where the Court explicitly called up all issues on remedy for trial. The parties were given the opportunity to cross-examine the witnesses tendered by the plaintiff and the third-party plaintiffs—and several of them took advantage of that opportunity—and to present witnesses on their own behalf. Indeed, the parties were repeatedly advised prior to the hearing that the hearing would be their opportunity to contest the remedy being proposed by the plaintiff. The burden of proof was not shifted. The Court's examination of the Preliminary Agreement will be undertaken pursuant to the standards applicable there-

to. Nevertheless, the Court's examination of the evidence for purposes of the issues relating to the remedy will be judged by trial standards. The fact of the matter is that the evidence presented in support of the remedy and its consistency with the National Contingency Plan was unrebutted. Therefore, as will be discussed in more detail below, there is no evidence before the Court to support any inference that the remedy proposed is improper or inconsistent with the National Contingency Plan, and therefore the burden of proof which was properly on the plaintiff and the third-party plaintiffs for purposes of the remedy and response costs issues in the complaints has been met.

*Findings of Fact*

The following facts are taken from the Executive Summary of the Focus Feasibility Study For Conservation Chemical Company Site, which was admitted into evidence and unrebutted and therefore taken as true by the Court:

The Conservation Chemical Company (CCC) site is located in the East Bottoms District of Kansas City, Missouri. The waste disposal site is located approximately 1.75 miles east of Interstate 435, along the Levee Road in Jackson County, Missouri. The only access to the site is from the Levee Road. The site is located within the city limits of Kansas City. The area is industrially zoned. In 1960, CCC was permitted to construct and maintain a chemical treatment basin, process area, and roadway ramp at the site. The permit was issued by the U.S. Army Engineer District, Kansas City and was expressly limited to issues related to the public rights of navigation.

At present, the CCC site contains miscellaneous surface structures (abandoned tanks and buildings) and six basins (presently covered) that were used for the storage, treatment, and disposal of a variety of chemicals, liquid wastes, and sludges. The dimensions and exact locations of the lagoons migrated over the site during the twenty year (1960–1980)

period that the site was in operation. Waste incineration was also practiced intermittently during the operational period of the site.

The exact nature and quantities of chemicals and wastes handled during the site's active operating period are unknown. However, reconstruction of available site operating records (many records were destroyed in a 1970 fire) indicates that the primary materials accepted at the CCC site included organics, solvents, acids, caustics, metal hydroxides, and cyanide compounds. Reports also indicate that pesticides, herbicides, waste oils, organic solvents, halogenated compounds, arsenic and elemental phosphorus were handled at the site. In addition, there are reports and some evidence that pressurized cylinders and other metal containers were placed in the lagoons. It is estimated that at least 28 million gallons of various type wastes were accepted between 1970 and 1980. The facility handled liquids, sludges, and solids.

CCC employed a variety of waste handling practices including solvent incineration, solvent resale, pickle liquor neutralization, cyanide complexation, chromic acid reduction, and ferric chloride/ferric sulfate recovery. Drum, as well as bulk liquid, sludge, and solid burial were also practiced at the site.

In 1975 the Missouri Department of Natural Resources (DNR) investigated the site and found it to be operating as a solid waste disposal area. Subsequently, the DNR requested that CCC cease the disposal of solid wastes at the site and that remedial actions be taken to clean up the site. In 1977 the Missouri Clean Water Commission ordered the site closed and covered. The surface of the waste was "stabilized" in 1979 and the site was closed.

Subsequent investigations by the EPA (1979 through 1984) and a Remedial Investigation (RI) (1984) conducted by the responsible parties indicate that pollutants are migrating from the site and have contaminated the aquifer beneath and adjacent to the site. Pollutants that have been detected in the ground water adjacent to the site include phenols, cyanides, heavy metals, and organics.

An Endangerment Assessment (Clements 1985) has been prepared and recommends the conduct of remedial activities at the site. The Endangerment Assessment evaluated the potential impacts of the site on the public health, welfare, and environment.

The Endangerment Assessment evaluated five routes of exposure from contaminants from the CCC site. Table 1.1 presents a tabular summary of the potential endangerment of human health or welfare or the environment resulting from exposure to contaminants released from the site.

The Endangerment Assessment indicated the need for implementation of remedial actions for the protection of the public health and welfare and the environment. This Feasibility Study was prepared in response to the needs identified in the Endangerment Assessment. The Feasibility Study evaluated alternative technologies and alternatives that could be implemented at the CCC site for mitigation and/or elimination of potential endangerment mechanisms.

Five categories of remedial actions were evaluated for implementation at the site including increased monitoring, source removal, source isolation, plume capture, and water supply replacement. Sixteen remedial technologies were initially evaluated for applicability to the CCC site. Nine technologies were found to be applicable and combined into twelve remedial actions. These twelve remedial actions were initially screened based on a evaluation of their environmental effects, environmental protection, and implementability/reliability. Nine alternatives survived the initial screening process and were subjected to detailed evaluation.

Nine criteria were used to perform a detailed evaluation of each alternative. These criteria included: reliability, implementability, technical effectiveness, environmental concerns, safety, operation

and maintenance, costs, regulatory requirements, and public acceptance. Using these criteria, it was possible to assess and identify the most appropriate alternative for the CCC site.

Based on the detailed evaluation of the nine alternatives, Alternative 4 was selected as the lowest cost alternative that is technology feasible and reliable and which effectively mitigates and minimizes damages to and provides protection of public health, welfare or the environment. Alternative 4 incorporates four major components including: a RCRA cap, a circumferential slurry wall containment barrier, a leachate recovery and treatment system, and an off site ground water monitoring program.

Cullinane and Crabtree, "Focus Feasibility Study For Conservation Chemical Company Site," January 24, 1985, pp. 1.1—1.5. The Alternative 4 discussed in the feasibility study is a less-refined version of the remedial alternative that was incorporated into the Preliminary Agreement. The technical details of the proposed remedial action were included in Attachment A to the Preliminary Agreement, which is included as Appendix A to this Order, and thus will not be analyzed point-by-point. However, some discussion of the elements of the proposed remedy is in order. The following summary description of the remedy is taken from the testimony of Mr. Morby:

The option that we selected, Your Honor, is composed of several different components. Among those we, of course, wanted some site and surface cleanup done first to put that site in order whereby we could apply the rest of the fix.... There are some things such as the tanks and buildings and that nature that have to be taken care of first. That would be done first. Then one of the things that goes to the heart of this option, of this remedial fix, is the construction of a slurry wall that would then tie in or key into the bedrock. This wall is then capped by a multi-layered cap that's in conformance with the Resource Conservation Recovery Act requirements. That then too is tied into the wall to provide a seal or an encapsulation of the entire waste area located therein. In addition to that we would look to the installation of an interior withdrawal well. We think that's very important, Your Honor, in that these walls are designed to be quite impermeable but like anything it has some propensity to leak and by putting that interior withdrawal well in, we can change the gradience [sic] and simply stated we would have a water level lower on the inside of this capsule than you would have on the outside and therefore always having an inward gradient towards that and not having anything to leak away or move away from that encapsulation. In addition to that, we would have treatment of that water that would come out or leach that would come out of this encapsulation. In addition we would want to do any groundwater monitoring in and around that site to verify what we have done in the way of remediating this site as well.

Transcript of Hearing, October 21, 1985, pp. 25–26.

Throughout this litigation, in hearings before the Court and the Special Master, various parties have contested the need for several of the components of the proposed remedy, most notably the slurry wall and the interior withdrawal wells and associated treatment system. Thus, some attention must be given to the evidence presented by the government justifying these components.

The CCC site, located at 8900 Front Street in Kansas City, Missouri, is within the 100-year floodplain and has been flooded in the past where the Missouri River rises and covers the site. Adjacent to the CCC site are the Mobay Chemical Company and the Kansas City Power and Light Company's Hawthorne Generating Plant. The Mobay Chemical Company uses groundwater for its wastewater treatment. The KCP & L Hawthorne Plant uses groundwater for fire protection. There is an agricultural field located directly adjacent to the property in which soybeans have been grown in the past. There are residences

located along the river, as well as businesses that are located near Interstate 435 in the area. Some of the residences north of the river use water supplied by domestic wells that are in the ground in that area. There are well fields downstream from the CCC site that utilize the water from the Missouri River aquifer. The City of Independence uses a wellfield down-gradient from the site as does the City of Liberty. The City of Lexington, Missouri, utilizes the Missouri River directly for withdrawal of water. The area around the CCC site has been planned for future industrial development which would utilize the groundwater in this aquifer.

Hazardous substances have been and are being released from the site and migrating toward the east and toward the Missouri River. It was estimated that the annual rate of discharge of hazardous materials from the site into the groundwater is in excess of 22,000 pounds, and that the likelihood of a significant rate of discharge continuing in the future is high. It was also opined that the likelihood of some or all of the hazardous substances being directly encountered by aquatic organisms or other living creatures in the course of their migration was fairly high in that a number of the substances are located at the surface and that a number of different mammals and birds and amphibious life frequent the area.

In summary, the government's witnesses determined that the slurry wall and interior withdrawal wells/treatment system were necessary in order to prevent further contamination of the aquifer and migration of hazardous substances to the Missouri River. Releases from the site would be essentially eliminated by the proposed remedy. Expert testimony concerning the remedy indicated that it possessed the following characteristics: that it would protect human health and the environment and that nothing less would; that it is cost effective and nothing more would; that it uses appropriate engineering technology and that nothing more is needed; that it is consistent with the remedy selected for other hazardous waste sites and is the one that is

proposed in the professional literature for solving the type of problem presented by the CCC site. Mr. Cullinane expressed the opinion that the proposed remedy is consistent with the requirements of the National Contingency Plan.

The other evidence submitted at the hearing related to the response costs incurred by the third-party plaintiffs. The evidence indicates that the third-party plaintiffs incurred costs in the amount of $1,913,811.87 on the Remedial Investigation. In addition, costs were incurred for what has been identified as remedial investigation tasks A, C and D, consisting of information relating to study of EPA wells, the evaluation of the slurry wall, and the Rock Creek POTW treatability studies, totalling $182,465.56. Finally, costs were incurred for the preparation of the third-party plaintiffs' feasibility study in the amount of $354,829.97. Dr. Hustad testified that all of these costs were reasonably incurred pursuant to orders of the Court and recommendations of the Special Master. In addition, both Mr. Morby and Mr. Cullinane testified that the data in the third-party plaintiffs' Remedial Investigation and Feasibility Study were useful and necessary to the government in formulating the proposed remedy.

It should also be noted that the plaintiff asked the Court to take judicial notice of the expenditures that the government has made to the Special Master's Reimbursement Fund as being response costs. Quite frankly, the Court is at a loss to determine the relevance of the request to the issues before the Court at this time. However, there was no objection to the request and the Court did take judicial notice that the government had incurred response costs in the nature of payments to the Special Master's Reimbursement Fund pursuant to orders of the Court.

Finally, the Court should make note of the efforts made by the government to notify interested persons of the hearing on the proposed remedy. The Preliminary Agreement itself was published in the Fed-

eral Register on August 19, 1985. 50 Fed. Reg. 33422. In addition, on October 8, 1985, the government mailed a letter to various persons advising them of the hearing. Persons receiving such letter included various state and local government officials, including officials of those cities whose water supplies might potentially be affected by contaminants leaching from the CCC site, politicians, representatives of news media, and representatives of various environmental groups. A copy of the notification letter and the list of persons receiving such letter is contained in Appendix B attached to this order.

*Conclusions of Law*

### A. *The Preliminary Agreement*

As it relates to the Preliminary Agreement, the purpose of the hearing on October 21, 1985 was not to pass final judgment on the details of the Preliminary Agreement other than as they relate to the remedial action proposed therein. It is understood by the Court and the parties to the Preliminary Agreement, as well as other parties to the litigation, that if the Preliminary Agreement is approved, the parties will proceed to prepare a final consent decree for submission and consideration by the Court for final approval. In this regard, it is assumed that prior to approval of that consent decree, the government will comply with the requirements of 28 C.F.R. § 50.7, a regulation of the Justice Department, which provides as follows:

(a) It is hereby established as the policy of the Department of Justice to consent to a proposed judgment in an action to enjoin discharges of pollutants into the environment only after or on condition that an opportunity is afforded persons (natural or corporate) who are not named as parties to the action to comment on the proposed judgment prior to its entry by the court.

(b) To effectuate this policy, each proposed judgment which is within the scope of paragraph (a) of this section shall be lodged with the court as early as feasible but at least 30 days before the judgment is entered by the court. Prior to entry of the judgment, or some earlier specified date, the Department of Justice will receive and consider, and file with the court, any written comments, views or allegations relating to the proposed judgment. The Department shall reserve the right (1) to withdraw or withhold its consent to the proposed judgment if the comments, views and allegations concerning the judgment disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper or inadequate and (2) to oppose an attempt by any person to intervene in the action.

(c) The Assistant Attorney General in charge of the Land and Natural Resources Division may establish procedures for implementing this policy. Where it is clear that the public interest in the policy hereby established is not compromised, the Assistant Attorney General may permit an exception to this policy in a specific case where extraordinary circumstances require a period shorter than 30 days or a procedure other than stated herein.

Presumably, the government's publication of the Preliminary Agreement in the Federal Register represents an attempt on its part to comply with the provisions of this regulation should it be determined to be applicable. Arguably, the regulation is triggered only by a final consent decree and not an agreement of the type represented by the Preliminary Agreement. Nevertheless, to the extent that the Court intends to give formal approval to the remedial action provisions of the Preliminary Agreement, the government's decision to publish the Preliminary Agreement cannot be faulted. In any event, if the regulation is applicable to the Preliminary Agreement, the Court finds that the provisions of 28 C.F.R. § 50.7 have been satisfied.

Neither 28 C.R.F. § 50.7 nor any other regulation or statute which has been brought to the attention of the Court or of which the Court is aware requires the Court to conduct a hearing on the Preliminary Agreement prior to its approval.

Nevertheless, the Court determined that a hearing on the Preliminary Agreement was not only permissible but desirable in light of the public interest in this litigation. Thus, the Court would have held a hearing on the agreement even had the decision not been made to also call up the complaints for hearing on the issues of remedial action. Moreover, holding a hearing on the Preliminary Agreement is also consistent with the procedure used in the only reported CERCLA opinion involving a consent decree, *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334 (S.D.Ind. 1982) (hereinafter *"Seymour"*).

The *Seymour* opinion is instructive because it not only discusses the legal standards by which a federal court should review a proposed consent decree, but also provides a useful example of the consent decree process in the context of a Superfund cleanup case. With regard to the former, Judge Steckler stated the guiding legal principles to be as follows:

> In deciding whether to approve a proposed decree, a court must inquire whether the decree is consistent both with the Constitution and with the mandate of Congress. *See United States v. Ketchikan Pulp Co.*, 430 F.Supp. 83, 86 (D.Alaska 1977); *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982). Second, the court "must assure itself that the terms of the decree are fair and adequate." *See United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. at 1072. Finally, the court must inquire whether the settlement is a reasonable one. *See In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). The underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest. *United States v. Ketchikan Pulp Co., supra*, 430 F.Supp. at 86. The court "must eschew any rubber stamp approval in favor of an inde-

pendent evaluation," *United States v. Hooker Chemicals and Plastics Corp., supra*, 540 F.Supp. at 1072, but because of the clear public policy favoring settlements, the court must not substitute its judgment for that of the parties. *See, Airline Stewards v. American Airlines*, 573 F.2d 960, 963 (7th Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190.

554 F.Supp. at 1337–38. Judge Steckler conducted a hearing in order to satisfy himself that the three criteria—legality, fairness and reasonableness—were satisfied by the consent decree proposed by the parties. Although certain aspects of the *Seymour* settlement have apparently come under some criticism, this court concludes that the *process* and *standards* employed by Judge Steckler were proper and should serve as the model to be followed here.

### 1. *Legality*

As was the case in *Seymour*, with regard to the factors of legality and constitutionality, none of the parties or other interested persons have raised objections to the approval of the Preliminary Agreement as being violative of law. The court finds that the statutes under which the Amended Complaint has been filed empower the United States to bring enforcement actions and actions for response costs. *See*, 42 U.S.C. § 6973, 42 U.S.C. § 9606 and 42 U.S.C. § 9607. As was stated in the *Seymour* opinion and in the other cases cited in the excerpt from that opinion, the authority of the United States and the Attorney General to settle litigation is well established. Not only is the remedial action proposed in the Preliminary Agreement not violative of any law, it is consistent with and furthers the policies of the statutes under which this action was commenced, as is discussed in more detail below.

### 2. *Fairness*

■ Obviously, the plaintiff and the four original generator defendants have no objection to the Preliminary Agreement as they are signatories to it and have urged

its entry upon the Court. Moreover, as is evident by the lack of participation in the hearing by other interested persons, there appears to be little question of fairness as to the effect of the proposed remedial action on other persons. The cross-examination of government witnesses conducted by the attorney for the Missouri Coalition for the Environment related to the remedy itself, which will be discussed in more detail below. As indicated previously, certain third-party defendants objected to the hearing process and the standards of review and burden of proof which they thought were being employed by the Court. Those objections were discussed and disposed of previously.

Of most critical concern to the Court are the objections to the Preliminary Agreement lodged by the other original defendants—CCC, CCCI and Norman Hjersted. Recognizing that the entire Preliminary Agreement, and not just the remedial action provisions, have a direct impact upon those parties as non-settling parties, the Court must consider its effect on those parties. At the request of the Special Master, the parties have extensively briefed the issue of the effect of settlement on non-settling parties. It is clear from the arguments and authorities presented by the various parties, as well as the Court's independent review of authorities, that the federal statutes under which this action was brought provide no clear guidance as to the effect of settlements upon non-settling parties. Furthermore, it may fairly be stated that the Court is not required to address this issue at this time and may not be required to address it at the time a consent decree is filed, if any.

Nevertheless, the Court deems it advisable to advise the parties of its preliminary views on this issue. Consideration of the effect of settlement upon non-settling parties cannot be divorced from the overall issue of the basis upon which liability will be apportioned among the parties. As indicated previously, CERCLA is silent as to the methodology to be applied as to the apportionment of costs among liable parties. However, it is clear that whatever method is utilized it must take into account a disparate group of liable parties, i.e., owners/operators, prior owners/operators, generators and transporters. Furthermore, the relative fault of liable parties within each group will depend upon the factual circumstances. Thus, particularly within the generator class of liable parties, different factors such as volume, toxicity, migratory potential, etc., come into play in assessing the culpability of each party. Thus, if these varying factors are to be given effect, the apportionment must be made upon the basis of some variation of comparative fault doctrine. The so-called "Gore Amendment" is premised upon such a concept. Only with this statutory background in mind can the Court meaningfully investigate the methods by which the common law addresses the effect of a settlement upon non-settling parties.

As has been discussed in the Comment to the Caveat to Section 886A of the Restatement of Torts (2d), there are three possible solutions for the situation in which one tortfeasor enters into a settlement agreement that does not purport to be a full satisfaction of the injured party's claim. First, the non-settling tortfeasors are still able to obtain contribution against the settling tortfeasor, despite the release. Second, the non-settling tortfeasors are not entitled to contribution unless the release was given not in good faith. Third, the injury party's claim is reduced by the proportionate share of the settling tortfeasor. The first solution was adopted by the 1939 Uniform Contribution Act. The second solution was adopted by the 1955 Uniform Contribution Among Joint Tortfeasors Act. The third solution was adopted by the 1977 Uniform Comparative Fault Act. As stated in the Restatement, each solution has its drawbacks and "no one is satisfactory."

 However, because contribution is a remedy that developed in equity and, more importantly, because the Court reads the legislative history of CERCLA to impose upon the judiciary an obligation to apportion responsibility in a fair and equitable

manner, the Court concludes that, in apportioning the responsibility of any party to this litigation, the Court must be mindful of that legislative history. The Court will not tolerate either a "windfall" or a "wipe-out" which results in an apportionment of responsibility which arbitrarily or unreasonably ignores the comparative fault of the parties, where there is a reasonable basis for allowing that comparison to be made.

▮ Accordingly, the Court advises the parties of its view that the effect of settlements upon non-settling parties should be determined in accordance with the 1977 Uniform Comparative Fault Act for the reason that the principles of that model act are the most consistent with, and do the most to implement, the Congressional intent which is the foundation for CERCLA. The Court expresses no views, at the present time, on the precise application of that act to future developments in this case. Moreover, notwithstanding the Court's views in this respect, the Court finds and concludes that the terms of the Preliminary Agreement are fair and adequate as to all parties.

### 3. *Reasonableness*

It is apparent that the hearing held by Judge Steckler in the *Seymour* case was most critical to the Court's determination on the reasonableness criterion, concerning which the Court established certain guidelines for its analysis of the consent decree:

> In considering the reasonableness of the Consent Decree, the Court has considered five factors: 1) the nature and extent of the potential hazards at the site; 2) the availability and likelihood of alternatives to the Consent Decree which would result in cleanup of the surface of the site; 3) the adequacy of the technical proposal of the work which will be undertaken; 4) the extent to which the Consent Decree furthers the goals of the statutes which form the basis for this litigation; 5) the extent to which the Court's approval of the Consent Decree is in the public interest.

554 F.Supp. at 1339. This Court will consider the same factors in analyzing the reasonableness of the remedial action proposed by the settlement agreement.

On July 2, 1985, this Court entered an Order approving portions of the Special Master's report filed on May 17, 1985. As part of that ruling, the Court determined that the CCC site posed an "imminent and substantial endangerment" to the public health, welfare or the environment within the meaning of 42 U.S.C. § 6973 and 42 U.S.C. § 9606. While that ruling was made on the basis of motions for summary judgment and was technically applicable only to specified parties against whom the United States sought summary judgment, no evidence was presented at the hearing on October 21, 1985, which would suggest that the ruling was not entirely appropriate as to all parties. Indeed, based upon the evidence introduced at the hearing, the nature of the endangerment is far more serious than that which was conceded by the parties for purposes of the motions for summary judgment.

The evidence establishes the existence of hazardous substances in the soil at the CCC site and in the groundwater and aquifer underlying the CCC site, and that hazardous substances were being released and discharged into the Missouri River. Furthermore, the Focus Feasibility Study suggests that the possibility exists that aqueous or non-aqueous contaminants are passing under the Missouri River and possibly contaminating the aquifer on the north side of the river. The certainty of that risk is unknown due to the fact that hydrogeologic modeling is incomplete at this time. In any event, it is clear that there is a serious environmental risk posed by the CCC site.

▮ The Court recognizes that alternatives to the Preliminary Agreement exist which would result in cleanup of the CCC site. Perhaps the most obvious is a Court-ordered cleanup following trial on the merits of this litigation. The unacceptability of that alternative, which would substantially delay implementation of a remedy, is equally obvious given the adequacy of the reme-

dy proposed by the Preliminary Agreement. It also appears that cleanup could be affected by the Government utilizing monies from the Superfund. There is no evidence before the Court, however, which indicates that cleanup would be effectuated at an earlier date under a government-funded process. Indeed, the procedures necessary for use of Superfund monies might lengthen the process and delay implementation of a remedy. Furthermore, this Court is of the opinion that CERCLA contemplates that hazardous waste sites will be cleaned up in the most cost-effective manner; spending precious Superfund monies on a site when there are responsible parties ready and willing to spend private monies to accomplish the same result would hardly be an efficient use of government resources. *See 40 C.F.R. § 300.-61(c)(2) (National Contingency Plan); accord, Industrial Park Development Company v. Environmental Protection Agency,* 604 F.Supp. 1136 (E.D.Pa.1985). Thus, all other things being equal, this Court believes that public policy demands that preference be given to the use of private funds for cleanup of hazardous waste sites.

■ The expert testimony indicated that the remedy proposed in the Preliminary Agreement would protect against the risk proposed by the CCC site and that no lesser remedy could adequately do so. The testimony also established that the proposed remedy employs acceptable engineering practices. Furthermore, it was stated that the remedy is consistent with that which has been selected for other hazardous waste sites and is the remedy which is proposed in the professional literature for solving the type of problem posed by the CCC site. The thrust of the cross-examination by the attorney for the Missouri Coalition for the Environment appears to be that a government consultant had previously suggested that the removal of the contaminated soil from the CCC site would be preferable to encapsulation, although the Court can only speculate on this point because no direct evidence was presented. Although statements elicited from cross-examination are "evidence," the possibility

that some other consultant might have suggested removal as the preferred remedy will not be considered to be particularly probative by this Court unless direct evidence is presented. The only competent evidence before the Court is the direct testimony of the government's witnesses and the analysis of various remedial options contained in the Focus Feasibility Study. That evidence clearly establishes that the proposed remedy is proper and preferable to other alternatives, including removal. Indeed, the evidence in the Focus Feasibility Study indicates that the removal alternatives suffered from several serious drawbacks: those options were the most expensive forms of remediation; questions exist as to the suitability of other sites to handle the materials; and extreme hazards are posed during the removal process and the process of transportation of the hazardous waste to another site.

This Court has no doubt that the remedy proposed by the Preliminary Agreement furthers the goals of the statutes which form the basis of this litigation. The proposed remedy provides for a cleanup of a hazardous waste site which is on the National Priorities List. Although it is unfortunate that several years of litigation elapsed before the parties could reach the agreement which will result in the cleanup, it is clear that remediation pursuant to the terms of the Preliminary Agreement will result in the quickest possible cleanup of the site. Moreover, the cleanup will occur without the necessity of expending Superfund monies in implementation of the remedy.

There can also be no question that approval of the remedy proposed in the Preliminary Agreement is in the public interest. The public interest demands a timely, adequate and cost-effective remedy for the CCC site. The public interest also favors the settlement of disputes and the termination of time-consuming, expensive litigation. Thus, it is clear that from the standpoint of both the short-range and the long-range public interest, the remedy proposed by the Preliminary Agreement, and the

partial resolution of the litigation effected thereby, are in the public interest.

In summary, for purposes of settlement, the remedy proposed by the Preliminary Agreement is legal, fair and reasonable. Therefore, after consideration of the standards which the Court deems to be appropriate and applicable to its review of the proposed remedy, that portion of the Preliminary Agreement is hereby approved. The parties are directed to prepare forthwith a consent decree incorporating the approved remedy for consideration by the Court after a hearing on the full consent decree on a date to be determined later. The plaintiff United States is directed to publish the proposed consent decree pursuant to the requirements of 28 C.F.R. § 50.7.

B. *The Appropriateness of the Remedy on the Merits and Third-Party Plaintiffs' Right to Contribution for Response Costs*

The Court recognized that while the appropriateness of the remedy and the costs associated therewith would certainly be binding upon the parties to the Preliminary Agreement, there was some question as to whether or not other non-settling parties would be bound by those determinations. Therefore, in order to avoid re-litigating these issues, the Court drew upon its authority pursuant to Federal Rules of Civil Procedure, Rule 42, to call up for trial those issues relating to the appropriateness of the remedy and the ability of the third-party plaintiffs to recover the costs of implementing the remedy as response costs, as well as other response costs already incurred. As was discussed at the outset, the Court considered the burden of proof to be on the third-party plaintiffs on these issues and the applicable standard of judicial review to be that appropriate for trial and not for review of a consent decree. With these points in mind, the Court will consider these issues on the merits.

The original generator defendants/third-party plaintiffs seek a ruling from the Court that other responsible parties are liable to them for a portion, to be determined later, of those response costs which they have incurred or will incur in implementing the remedy proposed by the Preliminary Agreement. As indicated previously, the evidence establishes that the four companies have expended $2,541,-107.40 to date relating to the Remedial Investigation (RI), and tasks associated therewith, and the Feasibility Study (FS) which they conducted. The evidence also establishes that they will incur substantial costs in the future to clean up the site in accordance with the terms of the Preliminary Agreement.

■ At the outset, it should be stated that a potentially responsible party may recover response costs from other responsible parties. This rule of law has been suggested in previous rulings of this Court and has been accepted in the better reasoned decisions that have considered the issue. *See, Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 291 (N.D.Cal.1984); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1143 (E.D.Pa.1982). *Contra, Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1058 (D.Ariz.1984) (recovery barred by equitable defense of unclean hands); *D'Imperio v. United States*, 575 F.Supp. 248, 253 (D.N.J.1983). Obviously, the fundamental purpose of CERCLA is to provide for the expeditious and efficacious cleanup of hazardous waste sites. Certainly, Congress intended and anticipated that potentially responsible persons would accept and assume the responsibility to effect cleanup. One legislative incentive for doing so was the availability of a private cause of action under Section 107 for response costs. To give effect to the legislative intent, the "any other person" language in 42 U.S.C. § 9607(a)(1)—(4)(B) must be construed to refer to persons other than federal or state governments, and not to persons other than those made responsible under CERCLA. *Pinole Point Properties, Inc. v. Bethlehem Steel Corp., supra*, 596 F.Supp. at 291; *City of Philadelphia v. Stepan Chemical Co., supra*, 544 F.Supp. at 1142. Application of the unclean hands defense in

this context would turn Congressional intent on its head.

Congress imposed two limitations, however, on the recovery of response costs by private parties under Section 107. First, such costs must be *necessary.* This first restriction has received scant attention in CERCLA litigation. Second, response costs incurred by private parties must be *consistent with the National Contingency Plan* (NCP) in order to be recovered. The second restriction has been litigated frequently.

■ The litigation concerning the "consistency" requirement centers on the relationship between Section 107 and Sections 111 and 112, the necessity for Environmental Protection Agency approval of response activities, and the listing of the site on the National Priorities List (NPL) as a prerequisite to response cost recovery. This Court has previously held that Section 107 "was meant to stand by itself" and that its provisions are independent of any requirements imposed under Sections 111 and 112. *United States v. Conservation Chemical Company,* 619 F.Supp. 162, 210–211 (W.D. Mo.1985). The Court also agrees with those decisions holding that neither EPA approval nor NPL listing are prerequisites for private recovery of response costs which are otherwise "consistent" with the NCP. *Pinole Point Properties, Inc. v. Bethlehem Steel Corp., supra,* 596 F.Supp. at 289; *Homart Development Co. v. Bethlehem Steel Corp.,* 14 Env't.L.Rep. 20718 (N.D.Cal. July 12, 1984); *cf., New York v. Shore Realty Corp.,* 759 F.2d 1032, 22 ERC 1625 (2nd Cir. April 4, 1985) (inclusion on the NPL not a condition precedent to cost recovery by a State). *Contra: Wickland Oil Terminals v. Asarco, Inc.,* 590 F.Supp. 72, 76 (N.D.Cal.1984); *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1447 (S.D.Fla.1984); *Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 24 Env't.L.Rep. 20376 (C.D.Cal. March 5, 1984).

The relief requested by the original defendants/third-party plaintiffs pertaining to response costs falls into four categories.

First, they ask the Court to find that they have properly incurred response costs for the Remedial Investigation ("tasks 1–13") in the amount of $1,913,811.87. Second, they request that the Court find that they have incurred costs in the amount of $182,465.56 for "Remedial Investigation tasks A, C and D." Third, they request a finding that they have properly incurred costs in the amount of $354,829.97 for the Feasibility Study they completed. Finally, they request a declaration by the Court that they will be entitled to contribution from the other parties for the future response costs they will incur in implementing the remedy pursuant to the terms of the Preliminary Agreement. As different analysis must be applied to each of these categories, they will be addressed separately.

■ The Court finds that the Remedial Investigation (tasks 1–13) constitute the Remedial Investigation which was approved by the Court as part of the Court's Order filed August 23, 1984. Implicit in the Court's approval of the Remedial Investigation was the finding that it was *necessary* within the meaning of CERCLA Section 107(a)(1)—(4)(B). Moreover, as noted earlier, both Mr. Morby and Mr. Cullinane testified that the third-party plaintiffs' Remedial Investigation was both useful and necessary to the government in formulating the proposed remedy. Third-party plaintiffs mistakenly take the position that the Court has already approved the *costs* of the remedial investigation as complying with the requirements of CERCLA. This is not the case. Indeed, in a recommendation of the Special Master, which was later approved by the Court, it was recommended that while the costs of the remedial investigation could be considered "response costs" within the meaning of CERCLA Section 107, the Special Master could not pass judgment as to the "reasonableness" of the costs incurred because evidence of those costs had not been presented. Special Master's Recommendation Concerning the Request of the Original Generator Defendants to Have the Costs of the RI/FS Allo-

cated Among the Parties, p. 12, approved by Order, filed November 8, 1984. Nevertheless, in light of the evidence presented, and particularly the lack of contrary evidence, the Court finds that the costs of the Remedial Investigation are necessary within the meaning of CERCLA Section 107. The Court has already ruled that the Remedial Investigation was deemed to be consistent with the National Contingency Plan, and that ruling is the law of the case. Special Master's Recommendation Concerning Defendants' Motion to Compel Access to Land Owned by C.C.C., p. 7, approved by Order, filed August 23, 1984. Thus, the $1,913,811.87 incurred to perform the Remedial Investigation constitute recoverable response costs under Section 107.

█ The second category of response costs for which the third-party plaintiffs seek recovery are those denominated as "Remedial Investigation tasks A, C and D." These tasks were described in the testimony of Dr. Hustad as follows:

> Task A was that information that was developed for study of the north of the river activities and what influence the site may have upon the groundwater north of the river. ... Task C was those items that were required for the evaluation of the slurry wall which is proposed to surround the site, and Task D was a study of the treatability of the waste which would be pumped from within the slurry wall to the ground surface.

Transcript of Hearing, October 21, 1985, p. 76. A review of the materials submitted to and approved by the Court for the Remedial Investigation, as well as the Court's knowledge of the activities described by the witness based upon statements made at previous hearings, leads the Court to the conclusion that the activities designated as Tasks A, C and D were not part of the "Remedial Investigation" which was approved by the Court. It appears to the Court that these tasks may have been performed in an effort to assist counsel for third-party plaintiffs in their defense of the litigation. If that were the case, the Court is not aware of any authority which would enable those parties to recover such costs as response costs. However, to the extent that the activities which were undertaken were useful and necessary to the formulation of the proposed remedy, the costs incurred in such activities might conceivably be recoverable as a part of the response costs for the remedy. Therefore, if the Court is ever required to hold an evidentiary hearing concerning the response costs associated with the remedy, the Court would entertain evidence at that time concerning the relationship of the costs incurred in such activities and the formulation of the remedy.

█ Unlike the third-party plaintiffs' Remedial Investigation, their Feasibility Study was not explicitly approved by an Order of the Court. However, it was understood by the Court and all of the parties that the four companies were undertaking a remedial investigation *and* feasibility study due to the professed inability of the government to complete such investigation and study within the time frame set forth by the Court. Indeed, the Feasibility Study was the subject of discussion at a number of hearings before the Special Master, who gave his approval to the defendants' preparation of the Feasibility Study even though such approval was not formalized by an Order of the Court. *See,* e.g., Transcript of Proceedings, Special Master Hearing No. 13, November 12, 1984, pp. 11–12.

The Court heard argument of counsel that because both the defendants and the plaintiff conducted feasibility studies, such costs were "duplicative" and therefore not "necessary" within the meaning of CERCLA Section 107. This argument is belied, however, by the testimony of the government's witnesses that the defendants' Feasibility Study was useful and necessary to the government in formulating the proposed remedy. Since the other parties did not present any evidence to the contrary, this testimony is considered to be conclusive on that point. Moreover, based upon the evidence that was presented, and again the lack of contrary evidence, the Court also finds that the defendants' Feasibility

Study is consistent with the National Contingency Plan. A review of the NCP indicates that the Feasibility Study conforms to the format specified therein. *See,* 40 C.F.R. § 300.68. Thus, the original generator defendants are entitled to contribution for response costs in the amount of $354,-829.97 for the Feasibility Study which they prepared.

Finally, the original generator defendants seek a present determination by the Court that they will be entitled to recover response costs in the future from the other parties for costs incurred in the implementation of the remedy pursuant to the terms of the Preliminary Agreement. In ruling upon a summary judgment motion previously filed by the plaintiff, this Court has previously held that the United States was entitled to declaratory relief for future response costs:

> Defendants lastly contend that the United States is not entitled to recover "costs" not yet incurred. The United States admits this, but argues that it is entitled to a present determination of the defendants' liability [f]or costs incurred in the future by the United States, since the United States has incurred some response costs. The United States is entitled to such a determination.

In *Pinole Point Properties, Inc. v. Bethlehem Steel Corporation,* 596 F.Supp. 283 (N.D.Cal.1984), plaintiff had already expended funds for investigation and cleanup. The court denied defendant's motion to dismiss plaintiff's claim for future liability of defendant because "[t]he contours of plaintiff's controversy with Bethlehem with regard to future costs are defined clearly enough to render appropriate a determination of future liability." 596 F.Supp. at 292. The court found the reasoning in *Jones v. Inmont Corp.,* 584 F.Supp. 1425 at 1430 (S.D. Ohio.1984) persuasive, which refused to dismiss a private plaintiff's claim for declaratory relief as to future response costs under Section 107(a)(4)(A):

> To require either the government or a private party to complete cleanup prior to filing suit would defeat the dual

purposes of CERCLA to promote rapid response to hazardous situations and to place financial burden on the responsible parties. Therefore, as the plaintiff's complaint does allege that they have already incurred some portion of the response costs necessary to clean up the site, the controversy is sufficiently real to allow the courts to determine defendant's liability for future costs.

584 F.Supp. at 1430.

Plaintiff sought recovery of response costs incurred, including attorney fees, prejudgment interest and a declaratory judgment for future response costs in *NEPACCO, supra.* The court acknowledged that granting declaratory relief was within the discretion of the court, citing C. Wright, A. Miller & Kane, *Federal Practice and Procedure,* § 2759 (2nd ed. 1983):

> The Court finds that granting plaintiff declaratory relief would be of benefit to all parties concerned. The issues have been firmly established and there is a real, present controversy between the plaintiff and defendants. While the Court cannot award costs until they are incurred, the Court can presently determine liability for future costs. [Brown v.] *Georgeoff,* 562 F.Supp. [1300] at 1315. Plaintiff established that it has already incurred thousands of dollars in costs and has proven that it expects to incur future costs in monitoring and assessing the maintenance of hazardous waste at the Denney farm site. Accordingly, the Court concludes that the defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the plaintiff relative to the Denney farm site that are not inconsistent with the national contingency plan.

579 F.Supp. at 852.

The State's complaint included a prayer for a declaratory judgment on the issue of the defendants' liability for rea-

sonably incurred costs in *State ex rel. Brown v. Georgeoff, supra:*

> Determination as to the availability of declaratory relief is left to the discretion of the Court. *C. Wright, & A. Miller, Federal Practice and Procedure,* Civil § 2759 (2d ed. 1983). In making this determination, this Court must consider whether this case represents "a real controversy between parties having adverse legal interest of such immediacy and reality as to warrant a declaratory judgment." *C. Wright, Federal Courts,* § 100. In this case, the controversy between the parties has advanced to a very "real" level. Ohio alleges that it has already sustained at least $825,000.00 in damages and seeks over $9 million more in damages. Further, the legislative history of CERCLA indicates that Congress intended to encourage states to promptly respond to the threats posed by hazardous waste dump sites. Response actions were not intended to await a determination of liability. In light of these factors, the Court concludes that this is an appropriate case for declaratory judgment on the issue of liability. Accordingly, the Court concludes that Ohio's complaint sufficiently alleges "costs incurred" as required by § 9607(a)(4)(A).

562 F.Supp. at 1316.

This case law appears clear that the United States is entitled to a present determination of the defendants' liability for costs to be incurred in the future by the United States.

Special Master's Report, May 17, 1985, pp. 79–82, approved by Order filed July 2, 1985. This same reasoning entitles the original generator defendants to a present determination of the other parties' liability for costs incurred by them for the implementation of the remedy if such costs constitute "response costs" within the meaning of CERCLA Section 107 and are necessary and consistent with the National Contingency Plan.

The proposed remedy, as described in Attachment A of the Preliminary Agreement, consists of seven components: (1) surface cleanup/surface preparation; (2) multi-layered surface cap; (3) slurry wall; (4) internal withdrawal well system; (5) internal withdrawal well water treatment system; (6) goundwater monitoring system; and (7) operation and maintenance program. The definition of "response" is CERCLA Section 101(25) includes "remedy, and remedial action." It is clear to the Court in reviewing the definition of "remedy" or "remedial action" in CERCLA Section 101(24) that all of the components of the remedy proposed for the CCC site are covered within that definition. *See,* 42 U.S.C. § 9601(24). Therefore, the costs associated with implementing the remedy proposed by the Preliminary Agreement would be considered response costs within the meaning of the statute.

■ It is also clear from the evidence discussed previously that the costs associated with the proposed remedy are "necessary" within the meaning of Section 107. The expert testimony also established that the proposed remedy would protect human health and the environment, that it was cost effective and that it utilizes appropriate engineering technology, and that it was therefore consistent with the National Contingency Plan. Moreover, from the Court's review of the National Contingency Plan, it is also clear that each component of the proposed remedy is specifically identified as an acceptable element of remedial action. *See,* 40 C.F.R. §§ 300.64, 300.68 and 300.70. Thus, the Court concludes that the original generator defendants' future costs for implementation of the remedy proposed in the Preliminary Agreement are recoverable costs under Section 107 of CERCLA.

*Summary of Rulings*

In summary, the following rulings are entered by the Court. The objections to the hearing of October 21, 1985 are overruled. Those portions of the Preliminary Agreement relating to the proposed remedy and implementation thereof by the four

original generator defendants are approved. The plaintiff and the settling defendants are ordered to prepare a full and final consent decree for review by the Court after hearing and after compliance with the provisions of 28 C.F.R. § 50.7. Finally, a partial declaratory judgment is hereby entered in favor of the original generator defendants as follows: (1) said defendants are entitled to receive contribution from other liable parties for the costs of the Remedial Investigation (Tasks 1–13) in the amount of $1,913,811.87; (2) said defendants are entitled to receive contribution from other liable parties for the costs of the Feasibility Study in the amount of $354,829.97; and (3) said defendants shall be entitled to receive contribution from other liable parties for their future costs of implementing the approved remedy in amounts to be determined at a future date. At such time as a hearing is held pertaining to contribution for the cost of implementing the remedy, the four original generator defendants may seek to establish at that time that "Remedial Investigation tasks A, C and D" were necessary to the formulation or implementation of the remedy and consistent with the National Contingency Plan.

It should finally be noted that the Court is mindful of the fact that the claims for response costs, or contribution, are asserted under RCRA, 42 U.S.C. § 6973, as well as CERCLA, 42 U.S.C. § 9607. This Court has previously held that the recovery of costs by the United States pursuant to its activities under RCRA may be an appropriate form of equitable relief, in the nature of restitution, in an action brought pursuant to 42 U.S.C. § 6973. *United States v. Conservation Chemical Company,* 619 F.Supp. 162, 201 (W.D.Mo.1985). The Court has not ruled, however, primarily because the issue has not been briefed by the parties, that a right of contribution among responsible parties exists under RCRA. *Id.,* p. 110. In light of the Court's ruling on the response cost issues under CERCLA, and, again, the lack of input from the parties, the Court continues to reserve judgment on that issue. The Court is also aware of the fact that the plaintiff continues to assert claims for response costs, some of which were incurred prior to the enactment of CERCLA, against the nonsettling original defendants. The Court is cognizant of the fact that other courts are divided on the issue of the recoverability of response costs incurred prior to the enactment of CERCLA and that recovery of those costs may be dependent upon the availability of RCRA for recovery of such costs. No opinion is expressed on that issue at this time but the issue will be determined when properly before the Court.

## APPENDIX A

### ATTACHMENT A

The remedial action will consist of the following elements:

(1) Surface Cleanup/Surface Preparation

(2) Multi-layered Surface Cap

(3) Slurry Wall

(4) Interior Withdrawal Well System

(5) Interior Withdrawal Well Water Treatment System

(6) Groundwater Monitoring System

(7) Operation and Maintenance Program

Detailed performance measures for each of the above items, monitoring programs to assure remedial action effectiveness, and contingency mechanisms to address foreseeable possibilities shall be developed in the Consent Decree. The following discussion outlines the agreement in principle. All actions taken under this outline will be in accordance with all federal, state and local requirements.

1.0 *Surface Cleanup/Surface Preparation*

1.1 The Settling Defendants shall, subject to the review and approval of the United States Environmental Protection Agency ("EPA"), construct all necessary support facilities for the remedial program and remove all structures and debris from surface areas.

1.2 The on-site building shall be decontaminated, demolished, and the rubble hauled to a landfill for disposal.

1.3 The building basement shall be filled to grade by utilizing on-site materials including solids remaining from the remedial investigation. The septic system will be grouted. All other depressions will be properly graded as noted in 1.14. This will be done in such a manner that the cap integrity will be maintained.

1.4 Decontamination of metal debris shall be accomplished using a detergent and hot water mixture followed by steam, and a hypochlorite rinse, where necessary.

1.5 All existing tanks and metallic debris shall be decontaminated, cut into pieces and transported to an appropriate disposal of recycling facility.

1.6 All existing wells inside the slurry wall shall be sealed by filling with grout.

1.7 Additional access roads, haul roads and parking areas shall be constructed as necessary to support this remedial program.

1.8 The levee road shall be maintained as necessary to support construction traffic.

1.9 Continuous 24 hour security shall be maintained at the site during the remedial action construction period.

1.10 An equipment/personnel decontamination station equipped with a high pressure spray washer and steam generator shall be constructed and maintained throughout the remedial construction program.

1.11 All cleaning water from the decontamination station, from metal cleaning operations and remaining liquids from the remedial investigation shall be tested and, if contaminated, shipped off-site for proper disposal.

1.12 The remedial investigation materials now on site may be incorporated into the basement filling operation as noted in 1.3. All solids may be directly utilized and semi-solids will be solidified prior to incorporation.

1.13 The Settling Defendants shall notify and obtain advance approval from EPA for all shipments of waste to off-site facilities. All applicable regulations for waste generation, transport, treatment and disposal shall be followed.

1.14 The existing surface of the CCC Site shall be regraded utilizing on-site soils to the fullest extent to fill in localized depressions prior to installation of the cap. The design and final grade and profile of the site surface shall be approved by EPA, and to the extent of their legal authority, by the Corps of Engineers, the Federal Emergency Management Agency (FEMA), and the City of Kansas City, Missouri.

1.15 After remedial construction is complete, the Settling Defendants shall construct a new security fence around and outside of the slurry wall.

1.16 Prior to initial grading of the site, any trees on-site larger than 2″ in diameter will be removed and disposed of properly.

2.0 *Multi-layered Surface Cap*

2.1 The Settling Defendants shall, subject to the review and approval of EPA, design and construct a multi-layered cap for the CCC site which meets RCRA regulations.

2.1.1 The first layer over the existing fill shall have two components. The upper component shall consist of a 20 mil synthetic membrane, padded on each side with 6 inches of membrane bedding or its equivalent. The lower component shall consist of 2 feet of compacted soil which has a hydraulic conductivity less than $1 \times 10^{-7}$ cm/sec.

2.1.2 The second layer (drainage layer) shall be a 12 inch thick sand layer, or its equivalent, with a hydraulic conductivity not less than $1 \times 10^{-3}$ cm/sec, and shall have a final bottom slope of not less than 3%.

2.1.3 The third layer (vegetated top cover) shall be at least 2 feet thick, support persistent vegetation, shall be planted, shall have as final slope of not less than 3% and shall have a surface drainage system capable of conducting

runoff across the cap without erosion rills.

2.1.4 Provisions shall also be made for paved chutes, flumes or rigid downpipes to transport water down the steep sided embankments. These embankments shall have a slope not greater than 5:1, (horizontal: vertical).

2.2 The embankments of the cap shall be protected from floods with a layer of riprap.

3.0 *Slurry Wall*

3.1 The Settling Defendants shall, subject to EPA review and approval, design and construct a 3-foot thick circumferential slurry wall (or "wall") around the perimeter of the CCC site encompassing monitoring well sites 1, 4, 5, and 11 as indicated in Attachment 1 (hereinafter "containment area"). The wall shall be constructed so that the inside of the wall is at least five feet from the well sites measured at the surface.

3.2 The 3-ft. thick slurry wall shall be composed of a homogeneous mixture of soil and bentonite. Remaining construction materials may be incorporated as fill on-site prior to cap installation provided that through good engineering practice the site will be geotechnically stable after the remedial action construction program is completed. Otherwise, off-site disposal of construction materials shall be provided in accordance with federal, state and local regulations. No wastes from the site or spoils from excavation near the site may be incorporated into the surface cap.

3.3 The slurry wall shall be keyed into bedrock and into the multi-layered cap.

3.4 The soil-bentonite backfill shall be designed to achieve a hydraulic conductivity of not more than $10^{-7}$ cm/sec.

3.5 During the design phase, a detailed geotechnical evaluation of the bedrock beneath the site shall be performed in order to determine the necessary measures that must be taken to assure that the bedrock will provide an adequate base for the containment system and to determine specific design requirements for the bedrock key.

3.6 Materials compatibility studies shall be performed during the design phase to determine which combinations of backfill and slurry will best minimize the risk of loss of wall integrity.

3.7 A Quality Control/Quality Assurance program shall be developed and implemented, subject to EPA review and approval, that will provide for, verification among other things, of trench dimensions, and composition of slurry and backfill, and the wall/bedrock interface.

3.8 Settling Defendants shall submit design documents for EPA review when they are 50 percent complete and for EPA approval when they are 100 percent complete.

3.9 An initial pump test shall be performed after installation of the slurry wall to evaluate the performance of the wall.

4.0 *Interior Withdrawal Well System*

4.1 The Settling Defendants shall, subject to EPA review and approval, design, install, operate and maintain an interior withdrawal well system whose purpose is to assure that contaminants are not released from the slurry wall containment structure and that there is inward flow of water across the slurry wall. The interior withdrawal well system will consist of one operating and one standby withdrawal well.

4.2 For each month, the monthly average water levels for the interior of the slurry wall shall be maintained at a level at least one foot lower than the monthly average water level for that month on the outside of the wall. In addition, for each month the minimum average monthly differential for each pair of piezometers shall be six inches.

4.2.1 Monitoring of water levels shall be accomplished by comparing continuous measurements of water levels in paired peizometers at four locations along the perimeter of the slurry wall.

4.2.2 Water levels shall be monitored on a continuous basis. Copies of raw monitoring data shall be submitted to EPA within 10 days of the last day of each month.

4.3 Drill cuttings and contaminated drilling fluids shall be collected, managed and disposed of as hazardous wastes pursuant to RCRA.

5.0 *Interior Withdrawal Well Water Treatment System*

5.1 The Settling Defendants shall design, contruct, operate and maintain, subject to EPA review and approval, a system for treating water extracted by the interior withdrawal well system from the containment area.

5.2 Any discharge of materials to any receiving waters shall be done in accordance with the NPDES regulations of the State of Missouri, and all other applicable federal, state and local laws and regulations.

5.3 The treatment system shall at least include metal precipitation, air stripping, and activated carbon filtration, and shall be designed to remove pollutants to levels which would not exceed NPDES permit limits. Additional studies shall be performed during the design phase to determine the required treatment unit sizes as well as whether alkaline chlorination or other treatment processes are necessary.

5.4 At their option, and with the approval of EPA, settling defendants may select other treatment methods than those set forth above which may be used upon proper demonstration of effectiveness. These methods shall require the discharge, if any, to meet the pollutant levels specified in the NPDES permit for the discharge from the site as noted in paragraph 5.3 and/or treatment of any residuals from a treatment process in accordance with RCRA standards.

5.5 All sludges generated by the treatment plant shall be managed and disposed of in accordance with applicable RCRA regulations.

5.6 Discharge of contaminants to the air through such processes as air stripping shall be in accordance with the requirements of the Clean Air Act and other applicable requirements.

5.7 At their option, Settling Defendants may arrange for treatment of wastewater at the Rock Creek publicly owned treatment works (POTW) provided that pretreatment of wastewater is performed prior to its entry into the POTW according to the provisions in RCRA 40 CFR 270.60 and all other applicable requirements.

5.8 Pretreated wastewater introduced to the Rock Creek POTW shall be in compliance with the limits of the current City of Independence ordinance. Any request for a Special Use Permit affecting those limits must be approved by EPA. EPA agrees to consider and process any request for a Special Use Permit in good faith.

5.9 Appropriate monitoring of wastewater shall be implemented to ensure that no PCB or dioxin contaminated wastewater is introduced into the POTW in accordance with state and local requirements.

5.10 Sludges from the pretreatment operations shall be managed in accordance with requirements of RCRA and other applicable requirements.

5.11 Any pipeline used to connect the CCC site to the POTW shall be equipped with a leak detection system and shall be installed in accordance with local construction ordinances, and shall be suitable for its intended purpose.

6.0 *Groundwater Monitoring System*

6.1 The Settling Defendants shall design, install, operate and maintain, subject to EPA review and approval, a groundwater monitoring and evaluation program whose purpose is to provide an assessment of changes in groundwater quality in the vicinity of the CCC site.

6.2 All above-ground structures existing CCC monitoring well sites 21 through 25 on the south side of the river shall

be grouted and the associated surface structures shall be removed.

6.3 The Settling Defendants shall implement an off-site groundwater monitoring program which includes water quality and water level monitoring surveys. The off-site groundwater monitoring program shall provide for monitoring of six (6)—two (2) well clusters at the approximate locations indicated on Attachment 2.

6.3.1 Water level monitoring of off-site monitoring wells shall occur on a monthly basis during the first three years of the program and subsequently as specified below. (See item 6.6)

6.3.2 The water quality surveys shall be conducted quarterly for the first three years with analysis for priority pollutants, selected water quality parameters and any other parameters which may, in the future, serve as indicator parameters. At a minimum, this analysis shall include the parameters listed on attachment 3.

6.3.3 The Settling Parties expect that based on data acquired during the first three years of monitoring, the defendants may be able to demonstrate a positive correlation between the occurence of various chemicals around the site and certain indicator parameters. The parties will review the data, and where such positive correlations exist so as to permit selection of a more limited number of parameters to be used in place of the full priority pollutant analysis, such limited analysis may be substituted for some or all future monitoring as indicated below. (See item 6.4)

6.4 After the first three years of data collections, Settling Defendants shall perform an assessment of this data and provide a report to EPA which describes the results of the water level and water quality monitoring program, which evaluates trends, and evaluates the use of indicator parameters for future monitoring.

6.5 As part of the above report, the Settling Defendants may propose for EPA

review and approval an alternate long term off-site groundwater quality and/or water level monitoring plan which employs indicator parameters. Within 90 days of receipt of such proposal, EPA shall respond thereto.

6.6 The settling defendants shall monitor the groundwater quality and levels according to the following schedule:

| | |
|---|---|
| Years 4–5 | Quarterly water chemistry |
| Years 6–20 | Annual water chemistry |
| Years 21–30 | Biennial water chemistry |
| Year 30 | Complete re-evaluation of water monitoring program; determination of need for future monitoring. |

6.7 Data collected from any part of this section shall be submitted to EPA within 30 days of receipt by the Settling Defendants, except for monthly offsite groundwater levels which may be submitted along with quarterly analytical data.

6.8 In addition to the reporting specified above, annual summary reports shall be prepared by the Settling Defendants and submitted to EPA which will assess the data available on groundwater quality and groundwater flow patterns relative to the reports of the previous year. These reports will continue on a yearly basis for the first twenty years, and biennially for years 21–30.

6.9 EPA shall be notified prior to each groundwater sampling event and, upon request, be provided with split samples or allowed to substitute quality control samples for concurrent analysis. EPA shall have access to groundwater monitoring wells and water level peizometers at all times.

6.10 All analysis of samples shall be performed using established protocols, handling, reporting and chain of custody procedures, all of which shall be described in detail in the groundwater monitoring plan developed during the planning or design phase of the remedial program.

7.0 *Operation and Maintenance Program*

7.1 The Settling Defendants shall develop and implement, subject to EPA review and approval, an Operation and Maintenance ("O & M") Plan for the CCC site which provides a schedule and description of maintenance activities.

7.2 Such plan shall include provisions for the cap, slurry wall, perimeter fence, monitoring wells, water level recorders, wastewater treatment system, sewer lines and any other structures constructed or installed pursuant to this remedial program.

7.3 An annual report of observations and corrective action results shall be submitted to EPA.

APPENDIX B

**U.S. Department of Justice**

United States Attorney

Western District of Missouri

October 16, 1985

The Honorable Scott O. Wright
Chief Judge
United States District Court
613 United States Courthouse
811 Grand Avenue
Kansas City, Missouri 64106

Re: United States v.
Conservation Chemical Co.

Case No. 82-0983-CV-W-5

Dear Judge Wright:

At the pretrial conference held on September 24, 1985 you requested that notice of the Court's hearing on October 21st to consider approval of the Preliminary Agreement entered into on August 2, 1985, be widely disseminated to the mass media as well as to appropriate public and private officials. I am enclosing herewith a copy of the notice letter and distribution list E.P.A. sent out on October 8th to satisfy your request.

Respectfully,
ROBERT G. ULRICH
United States Attorney
By /s/ Kenneth Josephson

KENNETH JOSEPHSON
Assistant United
States Attorney

KJ:jb
Enclosure

cc: All Liason Counsel
Robert H. Freilich
Special Master
R.F. Connor
Clerk of Court

October 3, 1985

Mr. Stan Jorgenson
Chief, Enforcement Section
Missouri Department of
Natural Resources
P.O. Box 1368
Jefferson City, Missouri 65102

Dear Mr. Jorgenson:

On October 21, 1985, a hearing will be held before the Honorable Scott O. Wright, United States District Court Judge, in the matter of *United States of America v. Conservation Chemical Company, et al.* This action was initiated by the United States to secure remedial action at a hazardous waste storage, treatment and disposal facility owned and operated by Conservation Chemical Company. The facility is located at 8900 Front Street in Kansas City, Missouri. The action also sought recovery of monies spent by the United States in responding to conditions at this facility.

The issue to be considered is approval of the Preliminary Agreement entered into by the United States and four original generator defendants, those being Armco, Inc., AT & T Technologies, Inc., FMC Corporation and IBM, Inc. The Preliminary Agreement includes an outline of the remedial action proposed for the site.

Members of the public are invited to attend this hearing and express their views on this issue. The hearing will be held at the United States Post Office and Courthouse, 811 Grand Avenue, Kansas City, Missouri. It will begin at 9 a.m. in Courtroom, number 4. A copy of the Prelimi-

nary agreement is enclosed for your review and consideration prior to the hearing.

Sincerely yours,
Rowena L. Michaels, Director
Office of Public Affairs

Enclosure

Conservation Chemical Company
Mailing List

Mr. Stan Jorgenson
Chief, Enforcement Section
Missouri Department of Natural Resources
P.O. Box 1368
Jefferson City, Missouri 65102

William Ford
Director, Division of Environmental Quality
P.O. Box 1368
Jefferson City, Missouri 65102

Honorable Richard Berkeley
Mayor of Kansas City
414 East 12th Street
Kansas City, Missouri 64106

Mr. Myron D. Caulkins
Director, Department of Public Works
City of Kansas City
414 East 12th Street
Kansas City, Missouri 64106

Mr. David Olson
Office of City Manager
City of Kansas City
414 East 12th Street
Kansas City, Missouri 64106

Mr. Robert Brown
Manager of Operations
Pollution Control Department
Fifth Floor
City Hall
Kansas City, Missouri 64106

Mr. A.M. Tinkey
President, Missouri Water Company
11610 Truman Road
Independence, Missouri 64050

Richard M. Biery, M.D.
Director of Health
Health Department
City Hall–10th Floor
411 East 12th Street

Kansas City, Missouri 64106

Mr. Dick Champion, Jr.
Director, Water Pollution Control Department
Rock Creek Waste Treatment Facilities
9600 Norledge
Independence, Missouri 64053

Mr. Robert Watson
County Commissioner, District 7
Jackson County Court House
415 East 12th Street
Kansas City, Missouri 64106

Honorable John C. Danforth
United States Senator
943 U.S. Federal Court House
811 Grand, Suite 943
Kansas City, Missouri 64106

Honorable Thomas F. Eagleton
United States Senator
U.S. Federal Court House
811 Grand, Suite 911
Kansas City, Missouri 64106

Honorable Alan D. Wheat
Member, United States House of Representatives
811 Grand, Room 935
Kansas City, Missouri 64106

Honorable Henry Panethiere
Missouri Senate, District 11
1301 Traders National Bank Building
1125 Grand
Kansas City, Missouri 64106

Honorable Carole Roper Park
Missouri House of Representatives District 52
11415 East Gill Street
Sugar Creek, Missouri 64054

Mr. Wayne Johnson
Environmental Engineer
Kansas City Power and Light Company
1330 Baltimore
Kansas City, Missouri 64141

Mr. Jack Lonsinger
Director, Environmental Affairs
Mopay Chemical Corporation
Hawthorne Road
Kansas City, Missouri 64126

Mr. Jim Arneson
President, Thomas Hart Benton Chapter

Sierra Club
4425 North Askew
Kansas City, Missouri 64120
Mr. Tom Crane
Executive Director, Coalition for the Environment
417 East 13th Street, Suite 300
Kansas City, Missouri 64110
Kansas City Times-Star
1729 Grand Avenue
Kansas City, Missouri 64108
The Kansas City Kansan
901 North Eighth Street
Kansas City, Kansas 66101
Independence Examiner ·
P.O. Box 458
Independence, Missouri 64051
Liberty Tribune
P.O. Box 239
Liberty, Missouri 64068
KUDL–FM
Box 753
Shawnee Mission, Kansas 66201
KCKN–AM
Box 1165
Kansas City, Kansas 66117
WDAF–AM Radio
Signal Hill
3030 Summit
Kansas City, Missouri 64108
KCMO–AM Radio
4502 Johnson Drive
Fairway, Kansas 66205
WHB–AM Radio
106 West 14th Street
Kansas City, Missouri 64106 ·
KCTV–Channel 5
4500 Johnson Drive
Fairway, Kansas 66205
WDAF–TV, Channel 4
Signal Hill
Kansas City, Missouri 64108
KMBC–TV, Channel 9
11th and Central
Kansas City, Missouri 64105
KSHB–TV, Channel 41
4720 Oak
Kansas City, Missouri 64112

## SUPPLEMENTAL MEMORANDUM OPINION

The Court held a hearing on November 4, 1985, a portion of which was devoted to the presentation of evidence by the plaintiff United States to establish the personal liability of Norman B. Hjersted. The plaintiff presented its evidence solely through the testimony of the defendant Norman B. Hjersted. Counsel for Mr. Hjersted presented rebuttal evidence through cross-examination of their client. For the reasons discussed below, the Court concludes that defendant Norman B. Hjersted is subject to statutory liability under 42 U.S.C. §§ 9606 and 9607.

Earlier in these proceedings in a ruling on a motion for partial summary judgment brought by the United States, this Court declined to impose liability on defendant Hjersted. The following is the portion of the Special Master's report, which was adopted by the Court, pertaining to the liability of Hjersted:

"Norman Hjersted founded CCC in 1960, and has been its president since its inception. He has also owned at least 93% of CCC's stock since 1960.

"Initially, Hjersted was CCC's sole technical person. 'Plant managers' were subsequently hired, but they reported directly to Hjersted. He controlled the company's fiscal matters and made decisions about the types of projects and business ventures CCC would undertake. He was primarily responsible for environmental controls at CCC and also acted as a chemical engineer. Even when he resided in Gary, Indiana (from approximately 1968 to 1974), Hjersted personally visited the KC site several times a month. After he returned to Kansas City in 1975 he was much more closely involved with the day-to-day operations of the KC site. In short, Hjersted '[is] the boss of CCC operations and ha[s] been all along.'

"The recent case of *New York v. Shore Realty Corp., supra,* [759 F.2d 1032 (2nd Cir.1985) ] held the owning stockholder who

managed a corporation liable under CERCLA Section 107, after analyzing the meaning of 'owner or operator.' The court determined that 'owner or operator' is defined to mean 'any person owning or operating' an onshore facility, 42 U.S.C. § 9601(20)(A), and 'person' includes individuals as well as corporations, 42 U.S.C. § 9601(21). Slip op. at 35 [759 F.2d at 1052].

> More important, the definition of 'owner or operator' excludes 'a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the facility.' *Id.* § 9601(20)(A). The use of this exception implies that an owning stockholder who manages the corporation, such as Leo Grande, is liable under CERCLA as an 'owner or operator.' That conclusion is consistent with that of other courts that have addressed the issue. *See, e.g., United States v. Carolawn Co.,* 14 Envtl.L.Rep. (Envtl.L. Inst.) 20,699, 20,700 (D.S.C. June 15, 1984); *NEPACCO,* 579 F.Supp. at 847–48. In any event, Leo Grande is in charge of the operation of the facility in question, and as such is an 'operator' within the meaning of CERLCA.

*Id.* at 36 [759 F.2d at 1052.] The court held Leo Grande liable for the abatement of the nuisance without piercing the corporate veil. New York courts have held that a corporate officer who controls corporate conduct, and thus is an active individual participant in that conduct, is liable for the torts of the corporation, so it was unnecessary to reach the question of piercing the corporate veil. The court concluded:

> As a final note, however, the district court should take into account one additional factor in supervising its injunction, a principle limiting perhaps to some extent. Leo Grande's liability for the future costs of abatement. The injunctive remedy is an equitable one; that abatement expenses may become prohibitive and disproportionate therefore may be taken into consideration.

*Id.* at 38 [759 F.2d at 1053].

"Corporate officers were also held personally liable under CERCLA in *United States v. Northeastern Pharmaceutical and Chemical Company, supra* [579 F.Supp. 823 (W.D.Mo.1984)]. Lee, the vice president of NEPACCO, the corporate entity that contracted through corporate representatives for the transport and disposal of hazardous waste, was held personally liable. He was directly responsible for arranging the disposal and transport of the hazardous waste at the site. He had direct knowledge and supervision of the contract. He assisted in the selection of the hazardous waste site.

"Lee argued that corporate officers are normally not personally liable for acts of the corporate entity. He contended that he did not own or possess the hazardous waste since the corporate entity had the ownership rights to the hazardous waste. He also alleged that the hazardous waste substance contained in the barrels dumped at the site was manufactured by another corporate entity.

"The court found such arguments of little significance to the imposition of liability. The court reasoned that Lee had actual knowledge of the drums and storage. Lee possessed the barrels within the meaning of Section 107(a)(3) and had direct supervision and knowledge of the disposal of the barrels. Further, under Section 107(a)(3), the person arranging for the disposal is not required to actually own or possess the hazardous waste. *United States v. NEPACCO, supra,* 579 F.Supp. at 847.

"Lee was found to be a 'person' within the definition in 42 U.S.C. § 9601(21). An analogous situation was dealt with in *Apex Oil Co. v. United States,* 530 F.2d 1291 (8th Cir.1976). There the court construed the statutory language of 33 U.S.C. § 1321(b)(5) and (6), the liability provisions of the Clean Water Act which imposes the same strict liability standard as CERCLA. The court held

> ... that a 'person in charge' can include both the individual employee and the corporation. Although the issue in *Apex Oil Co.* was whether an owner-operator

(the corporation in that case) could be held liable as a 'person in charge,' *Id.* at 1292–93, this Court considers the Eighth Circuit's analysis significant in defining an employee's liability under CERCLA: 'Section 1321(b)(5) speaks in terms of any person in charge. We note that it would not be inconsistent with the statutory language to hold both the employee and the corporation to its penaliies [sic] for failure to report a spill.' *Id.* at 1293 n. 6. 579 F.Supp. at 848. The definition of 'person' under the Clean Water Act is almost identical to the definition of 'person' under CERCLA. The court found that the term 'person' arranging for the disposal of hazardous substance should be given a liberal interpretation that may include both the employee and the corporation. Lee, then, acting as an employee, had the responsibility to and did arrange for the disposal of the hazardous waste pursuant to Section 107(a)(3).

"Lee can be classified as both an owner and operator of the NEPACCO plant due to his position as vice president and as a major stockholder. 42 U.S.C. § 9601(20)(A) states that an 'owner or operator'

means ... (ii) in the case of an onshore facility, any person owning or operating such facility ... Such term does not include a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his interest in the ... facility.

579 F.Supp. at 848. From the language of the statute a person who owns an interest in a facility and is actively participating in its management can be held liable for the disposal of hazardous waste.

"The court, in sum, found sufficient evidence to impose liability on Lee:

Lee had the capacity to control the disposal of hazardous waste at the NEPACCO plant; the power to direct the negotiations concerning the disposal of wastes at the Denney farm site; and the capacity to prevent and abate the damage caused by the disposal of hazardous wastes of the Denney farm site. Finally, Lee was a major stockholder in NEPAC-CO and actively participated in the management of NEPACCO in his capacity as vice-president.

579 F.Supp. at 849.

"Michaels, founder and president of NEPACCO as well as a major stockholder in the corporation, was also found to be strictly liable as an 'owner and opertor.' The court found that the same policy considerations expressed by Congress holding Lee liable would also necessitate the imposition of liability on Michaels.

"Personal liability of three corporate officers was found under CERCLA in *United States v. Carolawn Co.*, 14 Env'tl L.Rep. 20699 (D.S.C. June 15, 1984). Officers or representatives Tischler, McClure, and Gergel of Columbia Organic Chemical Company ('COCC') purchased the bankrupt Southeastern Pollution Control Company ('SEPCO'). The three officers or representatives incorporated a new company, known as South Carolina Recycling and Disposal, Inc. ('SCRDI') and served as officers of the new company. Tischler and McClure were personally involved in the operation of the site as a hazardous waste storage site. The three officers eventually sold the site to Carolawn.

"The court held the three subject to liability as owners of the site and also held Tischler and McClure liable as operators of the site. To reach the holding, the court examined the definition of 'person' and 'owner or operator.' The court also found the analysis in *NEPACCO* persuasive and concluded:

Thus, to the extent that an individual has control or authority over the activities of a facility from which hazardous substances are released or participates in the management of such a facility, he may be held liable for response costs incurred at the facility notwithstanding the corporate character of the business.

14 Env'tl L.Rep. at 20700. In addition, the defendants did not substantiate that the government could not pierce the corporate veil of SCRDI or COCC to reach them personally. The court referred to the well-established principles set forth in *Dewitt*

*Truck Brothers v. Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976) that must be considered before a determination can be made to pierce the corporate veil.

"Examining the definitions in CERCLA of 'person' and 'own or possess,' the Court in *United States v. Mottolo*, 14 Env'tl L.Rep. 20497 (D.N.H. Mar. 27, 1984) ruled that Sutera, the president and principal shareholder, of the corporation disposing of the hazardous waste was liable. The court found that Sutera was responsible for the conduct and management of the affairs and activities of the corporation and participated in arranging for the disposal of the wastes. Sutera argued that he operated the corporation to limit his personal liability and that he is not a 'person' who arranged for the transport or disposal of hazardous wastes within the meaning of CERCLA. He maintained that any relevant activities occurred while he acted in his capacity as president and shareholder, but that he did not engage in relevant activities as an individual. Sutera also argued that he did not 'own or possess' hazardous substances which is required for liability under CERCLA.

"The court noted that corporate officers may be individually liable for the torts of a corporation where they participate in the tortious conduct. Determining that Sutera was responsible for the entire operation of the corporation and that he did just about everything in the corporation, the court found him liable. As in the cases discussed above, the court found the corporation to be a 'person' within the meaning of CERCLA and that the person who arranges for disposal or transport for the disposal of hazardous substances need not own or possess the waste. *United States v. Mottolo, supra*, at 20499.

"Finally, the court addressed the issue of piercing the corporate veil. There was no allegation of fraud or misuse of the corporate form, and the court stated that to warrant piercing the corporate veil, it must be alleged with sufficient particularity that the corporation had no will or existence of its own separate from that of Sutera. Failure to state such a claim obviated the need to consider piercing the corporate veil.

"The former owner of the company which transported hazardous substances to the site was not held personally liable in *United States v. Wade, supra* [577 F.Supp. 1326 (E.D.Pa.1983)]. Citing *In Re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 398 (E.D.Pa.1981) and *Amabile v. Auto Kleen Car Wash*, 249 Pa.Super. 240, 376 A.2d 247 (1977), the court said:

> A corporate officer may be held liable if he personally participates in the wrongful, injury-producing act.

577 F.Supp. at 1341. In *Wade*, the former owner, Barnhouse, personally delivered drums to the site. However, the court said that the testimony was inadequate to establish the individual liability of Barnhouse since there was no evidence presented concerning the number or frequency of drums delivered, or their content. In addition, the court found that negotiations of Barnhouse to dispose of wastes were insufficient to establish personal liability. Finally, the court found that allegations that Barnhouse directed or participated in the disposal of wastes at the site were inadequate to establish personal liability. In this case, then, the court recognizes personal liability of a former owner, but does not find personal liability because of inadequate evidence.

"Thus, corporate officials who actively participate in the management of a disposal facility can be held personally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Hjersted could, therefore, be held personally liable under both subsection (a)(1) and (a)(2) of Section 107 of CERCLA as a current owner and as a person who owned and operated the facility at the time hazardous substances were disposed of if it were established that his participation was of the nature and degree which would warrant imposition of personal liability. However, the Special Master is reluctant to impose such liability based upon the factual record before him. While Hjersted may not have disputed the factual assertions made by the plaintiff, Hjersted

has vigorously opposed the imposition of personal liability. Under these circumstances, and giving due consideration to the caution which a court must exercise in ruling on summary judgment motions, the Special Master recommends that the Court not enter summary judgment against Hjersted at this time."

*United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 187–190 (W.D.Mo. 1985). Thus, the only viable issue for trial was whether or not the nature and degree of Hjersted's personal participation was such as would warrant imposition of liability.

The testimony elicited at the trial establishes these facts without contradiction. Norman Hjersted is a trained chemical engineer, having received a degree in chemical engineering from Rice Institute (now Rice University). He is a professional engineer registered in the State of Kansas. Prior to forming Conservation Chemical Company, Hjersted was employed as a chemical engineer by several companies, including Monsanto and Standard Oil of Indiana (Amoco). While working for Standard Oil in Sugar Creek, Missouri, Hjersted conceived of the idea to form what became CCC in order to more efficiently treat industrial wastes of one company with the wastes of another company. He personally drew the plot plan establishing the layout for the CCC site and personally supervised the construction. He conceived of several waste treatment processes that led to the disposal of wastes into lagoons on the site, and implemented other waste treatment processes suggested by others. In any event, Hjersted considered himself quite knowledgeable about all of the processes employed at the site.

Particularly during the early years of the CCC–KC operation, Hjersted spent about half his time at the Kansas City plant. Much of the remainder of his time was spent researching treatment processes and marketing the CCC operation. He administered the affairs of the corporation and executed contracts on its behalf. He hired and supervised employees.

With the formation of Conservation Chemical Company of Illinois, Hjersted moved the administrative operations of the corporation to Gary, Indiana in 1967 or 1968. After the move to Gary, Hjersted visited the Kansas City plant once a month or sometimes every other month. The plant manager and the administrative manager continued to report to Hjersted. During the time he was in Gary, Hjersted telephoned the plant manager every day. Communications with the plant managers included such topics as instructions on equipment modifications, customers to be served, and critiques of the performance of the plant managers.

CCC's business office moved back to Kansas City in 1974. After the move back to Kansas City, Hjersted visited the site approximately every other week and more frequently during the time CCC was implementing its closure plan pursuant to orders of the State of Missouri.

The Court concludes that Norman Hjersted's involvement with Conservation Chemical Company as its founder, chief executive officer and majority stockholder, is such as to warrant imposition of personal liability under CERCLA section 107. The high degree of personal involvement in the operation and the decision-making process was particularly acute during the early years of the corporation. The Court's conclusion is consistent with the rulings in the *Shore Realty, NEPACCO, Carolawn* and *Mottolo* cases discussed in the excerpted portion of the Master's report, as well as the more recent decision in *United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C. 1985). Thus, the Court concludes that Norman Hjersted is a liable party for purposes of 42 U.S.C. § 9607(a)(1) and (a)(2).